**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KENNETH MITAN. | : | NO. 08-760-1 |

**MEMORANDUM**

Pending before this Court are several motions filed by Defendant Kenneth Mitan seeking

release from pre-trial detention or in the alternative a de novo hearing, and dealing with related

procedural and evidentiary issues (Doc. Nos. 47, 48, 50, 51, 52, 66).

I.      **Factual Background**

Defendant Mitan and three co-defendants were indicted on December 18, 2008 for wire

and mail fraud (Doc. No. 1).  Defendant made an initial appearance before Magistrate Judge

Caracappa on December 23, 2008 (Doc. No. 10).  The Government informed Defendant prior to

his appearance that it intended to move to detain Defendant pending trial, and Defendant

consented to argue the Government's Motion for Pretrial Detention [hereinafter "Govt's Mot."]

at that hearing.  (Govt's Resp. Def.'s Memo. 1-2.)  Both Defendant and the Government

proceeded by proffer at the hearing.  (Id.)  The detention hearing was continued at the conclusion

of the hearing pending a Pretrial Service Report.

On January 6, 2009, Magistrate Judge Strawbridge resumed Defendant's detention

hearing and entered a Pre-Trial Detention Order for Defendant Mitan on January 7, 2009 (Doc.

No. 24).[1]  Judge Strawbridge found, pursuant to 18 U.S.C.A. § 3142(e), that the government had

_____

[1]The three co-defendants in this case are not being detained pre-trial and each entered a
$50,000 bond.

proved (1) by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of defendant as required and (2) by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community.  (Id.)  Judge Strawbridge considered the factors listed in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense charged, the weight of evidence against Defendant, and the history and characteristics of the Defendant.  Judge Strawbridge also found that Defendant posed a danger to the community.

On January 13, 2009, Defendant filed his Objections to Pre-Trial Detention Order and for Remand to Continue Evidentiary Hearing (Doc. No. 26).  The Government responded to the Objections (Doc. No. 35), and Mitan replied (Doc. No. 45).  Defendant also filed a Motion to Release Defendant on Own Recognizance or in the Alternative for a De Novo Hearing on January 26, 2009 (Doc. No. 51).

On January 30, this Court held a hearing to consider outstanding motions.  At the hearing, this Court stated that it would treat Defendant's Objections and Motion to Release Defendant as an appeal of Judge's Strawbridge's Order denying pre-trial release, pursuant to 28 U.S.C. § 3145(b).  (See Order, Doc. No. 58.)  Additionally, this Court ordered Defendant to file a brief in support of his appeal that responded to the Government's initial Motion for Pretrial Detention and to describe the witnesses and testimony he would produce at a detention hearing if granted. (Id.)  Mitan filed a Memorandum in Support of Request for Release or Evidentiary Hearing for Determination of Bond (hereinafter "Def.'s Memo.") on February 11, 2009 (Doc. No. 66).  The Government responded on February 18, 2009 (Doc. No. 82), and Defendant replied on February 24, 2009 (Doc. No. 86).  Defendant has also filed several motions related to his pretrial release

-2-

arguments, including two Motions to Strike (Doc. Nos. 47, 48), a Motion for Use-Fruits

Immunity (Doc. No. 50), and a Motion for Issuance of Subpoenas (Doc. No. 52).

## II.   <u>Legal Standard</u>

Under 18 U.S.C. § 3145(b), a defendant may file a motion for revocation or amendment

of a magistrate judge's detention order with the court having original jurisdiction over the

offense.  The district court's standard of review of the magistrate judge's order is de novo.  <u>See</u>

<u>United States v. Delker</u>, 757 F.2d 1390, 1394-95 (3d Cir. 1985); <u>United States v. Perry</u>, 788 F.2d

100, 103 (3d Cir. 1986) (noting the district court's de novo review).  The district court is not

required to hold a new evidentiary hearing but should carefully consider the decision and

reasoning of the Magistrate Judge and must fully explain the results it reached and the reason for

it.  <u>Delker</u>, 757 F.2d at 1395.

As an initial matter, the government must demonstrate that there are grounds for a

detention hearing under the specific provisions of § 3142 (f)(1) or (f)(2).  <u>U.S. v. Butler</u>, 165

F.R.D. 68, 71 (N.D. Ohio 1996).  As the Third Circuit explained:

> In a nutshell, a detention hearing, i.e., for considering detention as opposed
> to setting conditions of release, may be held upon an appropriate motion in a case
> involving:
> (1)     a crime of violence, 18 U.S.C. § 3142(f)(1) (Supp. II, 1985);
> (2)     a crime punishable by life imprisonment or death, Id.;
> (3)     a federal narcotics offense with a potential sentence of ten years or more,
>         Id.;
> (4)     any felony following convictions for two or more offenses in the nature of
>         the above, whether state or federal, Id.;
> (5)     a serious risk of flight, 18 U.S.C. § 3142(f)(2) (Supp. II, 1985); or
> (6)     a serious risk that the person will attempt to obstruct justice or to threaten,
>         injure or intimidate a witness or juror. Id.

<u>United States v. Himler</u>, 797 F.2d 156, 159 (3d Cir. 1986).

Once sufficient grounds for a detention hearing have been found, the judicial officer conducting the detention hearing shall consider the factors outlined in § 3142(g), including (1) the nature and circumstances of the offense charged, (2) the weight of evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[2]  18 U.S.C.A. § 3142(g).  The statute further describes history and characteristics considerations as follows:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law;

18 U.S.C.A § 3142(g)(3).  However, the Third Circuit has limited detention based on a defendant's danger to the community only to a showing that he is likely to commit one of the proscribed offenses listed in § 3142(f)(1).  Himler, 797 F.2d at 160.

At a detention hearing, the defendant has certain procedural safeguards, such as the right to be represented by counsel or have counsel appointed, "the opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise."  18 U.S.C. § 3142 (f).  The court has discretion whether to accept evidence

_____

[2]Defendant argues in his Reply brief that the § 3142(g) factors do not apply because they are only to be considered when setting bond conditions, not in determining whether the defendant should be released or not.  (Def.'s Reply 4.)  This is incorrect.  As the statute states, "The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required . . . , take into account the available information concerning [factors (1) - (4) described above]."  18 U.S.C. § 3142(g) (emphasis added).

by live testimony or proffer.  <u>Delker</u>, 757 F.2d at 1396.  However the rules concerning admissibility of evidence in criminal trials do not apply to information presented and considered at the hearing.  <u>Id.</u> (citing 18 U.S.C. § 3142(f)).  "The process that is due is only that which is required by and proportionate to the purpose of the proceeding."  <u>USA v. Smith</u>, 79 F.3d 1208, 1210 (D.C. Cir. 1996).

The government's burden to demonstrate a risk of flight is the preponderance of the evidence standard.  <u>Himler</u>, 797 F.2d at 161.

**IV.**   <u>**Discussion of Pretrial Detention Factors**</u>

Since this Court reviews the issue of Defendant's pre-trial detention de novo, it will examine the Government's arguments in its Motion for Pretrial Detention together with Defendant's objections and counter-arguments.  The Government contends that the following factors weigh in favor of Defendant's detention:

- Defendant's prior criminal contempt conviction in Michigan and subsequent flight from the state, resulting in Defendant being a fugitive from the state for over one year until he was extradited pursuant to a Governor's warrant

- Defendant's outstanding bench warrant in New Jersey for failure to appear for an arraignment on criminal charges similar to those at issue in this case

- Defendant's pending criminal case in Missouri on similar charges

- Defendant's lack of a permanent address and extensive domestic and foreign travel

- Defendant's motive to flee based on a personal relationship in Russia

- Defendant's lack of legitimate employment

- Defendant's multiple passports and drivers' licenses, at least one with incorrect information leading to a misdemeanor conviction in California

- Defendant's admitted use of aliases

- Defendant's poor record of court appearances in prior Michigan bankruptcy proceedings

- The Pretrial Services Report stating that Defendant presented a flight risk

Additionally, the Government asserts that Defendant's prior abuse of the legal process argues against granting him an evidentiary hearing.

In addition to its flight risk assertions, the Government initially argued and Magistrate Judge Strawbridge found that Defendant should be detained because he was a danger to the community. Defendant argues that this finding is in error because he was not found likely to commit one of the proscribed offenses listed in 18 U.S.C. § 3142(f)(1). Himler, 797 F.2d at 160. However, the Government is no longer relying on this theory as a ground for Defendant's pre-trial detention. (Govt's Resp. Def.'s Memo. 3). Therefore the Court will assess the evidence only as to Defendant's risk of flight.

### A.    Assessment of Detention Factors

#### 1.    Michigan Criminal Conviction and Fugitive Status

In its Motion for Pretrial Detention, the Government presents a Declaration of Attorney Mark R. Fox with eleven exhibits. These exhibits establish that Defendant fled the state of Michigan after the Circuit Court for the County of Ingham imposed a 30-day sentence against him for criminal contempt and that Defendant was a fugitive from June 2003 until approximately July 2004. (Govt's Mot. Decl. Exs. 6-10.) As a result, the Governor of Michigan executed and

issued two separate Requisitions for Rendition.  (Id. Exs. 8, 9.)  When Defendant was returned to Michigan following his arrest in Louisiana, he served his original jail sentence.[3]  (Id. Decl. ¶ 23.)

Defendant asserts that the government recanted this claim in the January 30 hearing. (Def.'s Memo. 17; Def.'s Reply 3.)  However, the Government did not recant its claim.  It merely corrected the assertion in its Motion for Pretrial Detention that the underlying factual basis for the contempt charge was failure to appear in a civil case.  (Hr'g Tr. 41:3-41:7.)  Instead, the basis for the contempt charge was abuse of process.  (Id.)  When Defendant tried to explain his contempt conviction at this Court's hearing, he merely described why he did not show up for his contempt hearing, not the validity of the underlying charge.  (Id. at 42:14-43:12.)

Defendant further claims that Fox's Declaration describing the Michigan contempt proceeding is perjurous and that Defendant had permission to leave the state.  Defendant offers as evidence the transcript of a court hearing in Michigan from June 28, 2002 (Def.'s Memo. Decl. Ex. E) and a letter to the Michigan judge in advance of the hearing detailing Defendant's alleged violations (id. Ex. F).  This hearing concerned allegations that Defendant had violated his bond order, which allowed him to leave the state with notice pending the appeal of his criminal contempt conviction.  The court denied a motion to revoke Defendant's bond, determined that Defendant had been complying with the terms of the bond order, and further clarified its terms. (Id. Ex. E.)

_____

[3]At this Court's January 30, 2009 hearing, when asked whether he previously had been in prison, Defendant responded "no."  (Hr'g Tr. 40:23-24, Jan. 30, 2009.)  When questioned further, Defendant admitted to having been in "jail" on multiple occasions but never "prison," arguing that based on his understanding of the terms, he previously had been detained pretrial but had never served a sentence following a conviction.  (Id. at 45:2-47:14.)  The Court is not familiar with such a distinction between "jail" and "prison."  Despite responding that he had never been to prison, Defendant admitted to serving his criminal contempt sentence in Michigan.  (Id.)

Defendant's argument does not have merit.  Defendant cites to this hearing in isolation as evidence that he was not a fugitive and had permission to leave the state, but he does not explain the events subsequent to this proceeding.  The bond order reviewed in the hearing cited by Defendant was issued only for the pendency of the appeal of his criminal contempt conviction. When the Michigan Court of Appeals affirmed Defendant's conviction on September 17, 2002, the bond order required that Defendant surrender himself.  (Gov't's Mot. Decl. Ex. 3.)  Defendant further appealed his conviction to the Michigan Supreme Court, which denied his application for leave to appeal on May 30, 2003.  (Id. Ex. 5.)  It was after this denial that Defendant fled in direct violation of his bond order, and a bench warrant was issued for him on June 10, 2003, followed by two Governor's Requisitions for Rendition.  (Id. Exs. 6, 8, 9.)

Defendant also asserts that his bankruptcy filing in California during his appeal of his Michigan criminal conviction stayed the criminal contempt proceeding, and therefore he was not a fugitive.[4]  (Def.'s Memo. 19.)  He claims that his California counsel advised him not to appear for his criminal proceedings in Michigan and wrote a letter to the Michigan judge to this effect. (Id.)  However Defendant does not offer any evidence of his bankruptcy in California, a stay of the Michigan proceeding, or any communication with Michigan regarding this bankruptcy. Defendant has proposed that his lawyer in his Michigan proceeding and appeal, Scott Mandel, testify to the fact that Defendant honored his bond conditions up until Defendant's California counsel advised Defendant that Defendant's bankruptcy stayed the criminal proceedings.  (Id. 26-

---

[4]Defendant filed for bankruptcy in the Central District of California on May 19, 2003. See In re Mitan, 178 Fed.Appx. 503 (6th Cir. 2006) (discussing history of the bankruptcy proceeding).  The case was transferred to the Eastern District of Michigan on July 30, 2003.  Id. at *1.  When the Bankruptcy Court held two conferences in January 2004, Defendant did not appear.  Id.

27.)  However, this testimony would be irrelevant, since the Government is only arguing about
Defendant's conduct after the exhaustion of his appeal, when his bond order was no longer valid
and he was required to serve his jail sentence.  Instead, the contempt charge in Michigan
culminated in a bench warrant for Defendant's arrest when he failed to appear, two Governor's
warrants against Defendant, and his ultimate extradition back to Michigan to serve his sentence.
These facts reflect adversely on Defendant as to risk of flight and suggest detention in this case.

Defendant names the case of In re Kirkpatrick for the proposition that the bankruptcy
automatic stay, 11 U.S.C. § 362(a), applies to criminal contempt proceedings arising out of civil
cases, even though criminal actions are not stayed by bankruptcy under § 362(b)(1).  Although
Defendant does not offer a citation for this case, the Court believes he is referring to In re
Kilpatrick, 160 B.R. 560 (Bankr. E.D. Mich. 1993).  However Kilpatrick does not hold that
criminal contempt proceedings are stayed by bankruptcy.  Instead, it holds that once a debtor has
filed for bankruptcy, the state can not impose criminal sanctions for failure to pay a dischargeable
debt.  Id.  Furthermore, there is significant authority that while bankruptcy stays civil contempt
proceedings, it does not stay criminal contempt proceedings.  See In re Galmore, 390 B.R. 901
(Bankr. N. D. Ind. 2008) ("The automatic stay of § 362(a) lies unless one of the specific
exceptions of § 362(b) is applicable.  Proceedings for constructive civil contempt are not among
these exceptions. . . .  That provision [§ 362(b)(1)], obviously, would afford an exception from
the automatic stay-but only for formal proceedings for criminal contempt) (internal citations
omitted) (emphasis in original); In re Wiley, 315 B.R. 682 (Bankr. E.D. La. 2004) ("Certain
exceptions exist to the reach of the automatic stay, among them that criminal actions, including
criminal contempt proceedings, are not subject to the automatic stay.").

-9-

To determine the nature of a contempt order, "the stated purposes of a contempt sanction alone cannot be determinative."  Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828 (1994).  Instead, a contempt sanction is civil if it is remedial or for the benefit of the complainant; a contempt sanction is criminal if it is punitive, to vindicate the authority of the court.  Id.  In the Michigan proceeding, Defendant was convicted of two counts of criminal contempt for "willful disregard of this Court's authority" and for "[a]ctions in violation of a court order."  (See Govt's Mot. Decl. Ex. 1 at 11, 14.)  The court imposed a 30-day jail sentence for the criminal contempt.  (Id. Ex. 2.)  This contempt action was therefore criminal in nature, since it served as a punitive measure to sanction Defendant.  Defendant's alleged bankruptcy filing in California did not stay his criminal proceeding and in no way excused him from serving his affirmed sentence in Michigan.

Finally, Defendant claims that his contempt proceedings were eventually dismissed but again provides no evidence of this and instead seeks to cross-examine Mark Fox to refute his Declaration.  Yet Fox's Declaration is supported by eleven exhibits that show that Defendant was convicted of criminal contempt in Michigan, this conviction was affirmed on appeal, Defendant did not surrender himself pursuant to the terms of his bond upon exhaustion of his appeal, a bench warrant was issued for Defendant's arrest in Michigan, Defendant was subsequently arrested in Illinois, the Governor of Michigan signed two separate Requests for Rendition of Defendant, Defendant was again arrested in Louisiana, and Defendant was finally extradited back to Michigan.  These supporting documents are all public records and court proceedings and speak for themselves.  Defendant has not offered any evidence to refute these documents.

These facts show that Defendant has exhibited complete disregard for law enforcement

and court orders in the past.  In Himler, the Third Circuit found that the defendant's prior record of appearing in court as required upon release was a factor in favor of his pre-trial release.  797 F.2d at 162.  Here, Defendant's failure to appear in Michigan and subsequent flight from the state weigh against his pre-trial release.  Based on the § 3142(g)(3)(A) factors of past conduct, criminal history, and record concerning appearance at court proceedings, the documented facts pertaining to Defendant's criminal conviction in Michigan and fugitive status appear sufficient by themselves for this court to find that Defendant presents a flight risk.  However, this Court will discuss the remaining arguments offered by both parties.

2.    New Jersey Charges and Bench Warrant

The Government alleged in its Motion for Pretrial Detention that Defendant failed to appear at a hearing on or about September 2, 2008, in Atlantic County, New Jersey, for his arraignment on criminal charges similar to those at issue here.  (Govt's Mot. 3, 5.)  It further claims that a bench warrant was subsequently issued for Defendant by the Superior Court.  (Id. 5.)  Defendant argues that he was in custody in Missouri on September 2, 2008, and informed the New Jersey court of his inability to appear.  (Def.'s Memo. 16.)  Following his release in Missouri, Defendant claims that Yvonne Maher, the New Jersey Deputy Attorney General involved in this matter, did not direct him to turn himself in to New Jersey.  (Id.)  Defendant wants his former attorney, Judd Aaron, to testify regarding Aaron's contact with the New Jersey Attorney General's Office.  (Id. at 29.)  Defendant also wants Todd Heck to testify that there is no basis to the charge in New Jersey.  The Government asserts in its response that Yvonne Maher of the New Jersey Attorney General's Office does not remember Defendant offering to turn himself in relation to the Atlantic County charges.  (Govt's Resp. Def.'s Memo. 7-8.)

-11-

Despite the differing allegations, Defendant does not dispute the existence of pending charges against him in New Jersey.  Upon independent inquiry, this Court confirmed that there is an existing warrant against Defendant in New Jersey.[5]  This pending charge and warrant are evidence of Defendant's past conduct, criminal history, and record of appearance at court proceedings.

3.    <u>Missouri Indictment and Bond Order</u>

The Government also asserts that Defendant is under indictment in Christian County, Missouri, for defrauding small businesses by negotiating their sale under false pretenses and diverting assets, similar to the charges he faces here.  (Govt's Mot. 3.)  Defendant does not dispute the similar nature of this pending criminal case.  However, Defendant argues that he appeared for his preliminary examination in Missouri, he was released pending trial, and he has fully complied with the terms of his Missouri Bond Order.  The Order in that case, issued October 9, 2008, set bond at $100,000, with the following conditions: out-of-state movements only if authorized by the court, a restriction on foreign travel, twice-weekly contact with the bondsman, and restrictions on contacting certain individuals including Defendant's co-defendant.  (Def.'s Memo. Ex. A.)  The Missouri court later granted Defendant's motion to leave the state.  (<u>Id.</u> Ex. B.)

Defendant wishes to have David Wendel testify as to his innocence in this case.  However such testimony would relate to Defendant's ultimate culpability in an unrelated criminal case, not his risk of flight in this case.  Therefore Wendel's testimony is irrelevant to pretrial detention.

_____

[5]However the Federal Detention Center in Philadelphia, where Defendant is currently detained, does not have a record of any detainers.

Defendant also wishes to have Chris Lentz, his Missouri bondsman, testify as to his compliance with his bond order.  However, the Government does not dispute his compliance, so this testimony is not necessary to resolve competing allegations.  As Defendant suggested, the undersigned contacted Judge Carter, who is presiding over Defendant's criminal case in Missouri.  Judge Carter confirmed that he had lowered Defendant's bond to an amount Defendant could post and that Defendant had always appeared when requested.  However, Judge Carter stated it is the practice in Missouri to detain criminal defendants pretrial only when they pose a risk of violence.  This is a different standard than that followed by the federal courts.

Defendant's appearance in Missouri and compliance with the bond order are relevant evidence weighing in favor of his release.  However the mere existence of this pending charge weighs against Defendant's release since "at the time of the current offense or arrest, the person was . . . on other release pending trial . . . ."  18 U.S.C.A. § 3142(g)(3)(B).  In addition, other evidence discussed above and below shows that Defendant has a poor record concerning appearance at prior court proceedings.

4.    Lack of a Permanent Address and Extensive Domestic and Foreign Travel

The Government alleges that Defendant has no ties to the local community, does not have a permanent address, has engaged in near constant travel throughout the United States, and is known to live out of his automobile for extended periods.  (Govt's Mot. 6.)  The Government further asserts that Defendant has traveled to twenty-five countries since 2004, including at least nine trips to Russia.  (Id.)  Defendant admits that he has no ties to the local community but claims he will rent an apartment in the jurisdiction if required.  (Hr'g Tr. 44:11-16, Jan. 30, 2009.)  He also notes that his co-Defendants have no local ties but were released.  (Id.)

-13-

Defendant does not deny his foreign travel but asserts he has not left the country since so ordered by the Missouri court.  Further Defendant asserts that the Missouri court holds his only passport.

As noted in the Pretrial Services Report, Defendant claims his father's address in Farmington Hills, Michigan as his home address, and also describes sharing his mother's residence.  Defendant's father confirmed his residence there.  (Id. at 42:7-9.)  Defendant does not deny his extensive domestic travel but claims that he has complied with all court orders regarding travel; he denies living out of his car.  (Def.'s Memo. 19.)

The Court notes that Defendant does not have ties to the local community but does have a home address with his father in Michigan.  Yet based on court records, the Defendant has been involved in criminal and civil litigation, as well as bankruptcy proceedings, in California, Louisiana, Kentucky, Arkansas, Illinois, Michigan, Missouri, Virginia, Florida, New Jersey, and Pennsylvania over the last fifteen years, suggesting that Defendant lacks ties to any particular community and has conducted his affairs in multiple states.  Defendant's foreign travel is not a proper consideration under § 3142(g), and as Defendant notes, opportunity for flight is not a reason to deny bail.  See Gov't of V.I. v. Leycock, 678 F.2d 467 (3d Cir. 1982).

5.     Defendant's Ties to Foreign Countries

The Government alleges that Defendant has motives to flee to Moscow, Russia, because he has a paramour and possible fiancé who resides there named Svetlana Grishnia.  (Govt's Mot. Pretrial Detention 8; Govt's Resp. Def.'s Memo. 11 ¶ 1.)  The Government further contends that the Defendant has been directing funds to Ms. Grishnia for many years.  (Govt's Resp. Def.'s Memo. 11 ¶ 1.)  In addition, the Government alleges that it has learned since the hearing with Judge Strawbridge that Defendant may have attempted to purchase real estate in Costa Rica,

-14-

Brazil, or Mexico prior to or during 2005 based on documents it recovered from Defendant's vehicle in California in 2005.

Defendant denies that he has fraudulently diverted funds or that he is presently engaged to Ms. Grishnia.  (Def.'s Memo. 21.)  Defendant also asserts that the documents recovered from his vehicle regarding foreign real estate were illegally seized without a warrant.  (Def.'s Reply 11.) Despite Defendant's argument, the "rules concerning admissibility of evidence in criminal trials" do not apply to pre-trial detention proceedings.  18 U.S.C. § 3142(f).  In order to further dispute the Government's contention, Defendant wishes to call witness Charles Taunt, the trustee in Defendant's Michigan bankruptcy proceeding, to testify that after a thorough review of Defendant's assets, Taunt found no international assets.  (Id. at 13.)  Defendant also wishes to subpoena the Government's evidence about international real estate and transfers of money to Ms. Grishnia.  (Id. at 14.)

Because these allegations are contested and the Court has no specific documentary evidence to consider at this time, it will not consider these as a factor for or against detention.

      6.     <u>Defendant's Lack of Steady Employment</u>

The Government asserts that Defendant does not have legitimate employment and would return to his prior fraudulent activity if he were released by this Court.  The Government also alleges that Defendant's parents have received money from him and his associates in recent months related to their fraudulent activity.

The Defendant asserts that his business activities are not fraudulent and wishes to call multiple witnesses to refute the indictments and allegations related to his business activities. Defendant further asserts that he was employed by Tuckahoe Enterprises, Inc. at the time of his

arrest in this case, from which he received recent income checks of $1,600 per week.  (Def.'s Memo. 20; Ex. G.)

The legitimacy of Defendant's employment serves as the basis of this criminal indictment and therefore awaits trial as to Defendant's ultimate guilt or innocence.  This Court will not hear witnesses at this time related to Defendant's underlying charges.  The pretrial detention hearing should not be "unnecessarily transform[ed] . . . into a full-fledged trial or defendant's discovery expedition."  U.S. v. Acevedo-Ramos, 755 F.2d 203, 207-08 (1st Cir. 1985).  However, Defendant did not provide any evidence to support a conclusion that he has steady employment over any significant period of time, since he did not describe the length or nature of his employment with Tuckahoe Enterprises.  Related to the likelihood of Defendant returning to his allegedly fraudulent business activities, Defendant stated to the Court at his January 30, 2009 hearing that if he were granted release and allowed to resume his business activities, he intended to do so in order to raise money for his defense.[6]  (Hr'g Tr. 66:10-15, Jan. 30, 2009.)

### 7.    Defendant's Multiple Identifications

The Government asserted that Defendant has obtained drivers' licenses from four different states in the past four years: California, Colorado, Indiana, and Michigan.  (Govt's Mot. 8-9.)  The Government argued that three of these were obtained under false pretenses.  (Id.) After obtaining additional evidence, the Government admitted that the Colorado drivers' license listed a valid post office box address and that the Indiana license was actually obtained in 2001, not 2005, and is now expired.  (Govt's Resp. Def.'s Memo. 6, 10 n.4.)  The Government

---

[6]At that hearing, the Court ordered that Defendant state in his brief exactly what he would do to earn $100,000 (the estimated legal costs of his defense) in a short period of time.  (Hr'g Tr. 66:18-23, Jan. 30, 2009.)  Defendant did not do so.

obtained new evidence that a Michigan driver's license issued to Defendant had been doctored, as discussed below.  (Id. Ex. C.)  In addition, the Government claims that Defendant has procured five passports in the past ten years.  (Govt's Mot. 9.)

Defendant argues that he only had two drivers' licenses from two states in the last four years.  (Def.'s Memo. 23.)  He contests the Government's assertion that the Colorado and Indiana licenses were obtained under false pretenses and seeks testimony from David Wendel to testify regarding the validity of his Colorado license.  However since the Government is no longer contesting the validity of the address on this license, this testimony would be irrelevant. Defendant admits to a 2005 misdemeanor conviction in California for having an incorrect address on his California drivers' license.  (Hr'g Tr. 46:13-17, Jan. 30, 2009.)

Defendant further argues that he can explain each of the passport issuances.  He claims that a passport issued in 1999 is now expired; a passport issued in 2002 was voided when it was taken from him by a Redondo Beach, California police officer; a passport issued in 2004 was a one-year passport, which was renewed in 2005, so the 2004 and 2005 passport are the same; the 2005 passport was lost, later found, and turned into the State Department; and a 2006 passport, his only existing, valid passport, is in custody of the Missouri court pursuant to his bond order. (Id. at 51:21-52:17.)  Defendant seeks to have Dana Haskins from the State Department testify regarding the passport allegations and the fact that the 2005 passport was turned in.  The Government counters that Ms. Haskins testimony is irrelevant, since it is not suggesting Defendant had more than one passport at a time but that Defendant may possess an expired or inactive passport, which he could use as false identification.  (Govt's Resp. Def.'s Memo. 8 ¶ 5.)

In support of his arguments against risk of flight, Defendant cites to Cruz, in which the

defendant was released even though he possessed two passports and two drivers' licenses in his name, traveled abroad extensively, and had a foreign paramour. U.S. v. Cruz, 363 F.Supp.2d 40 (D.P.R. 2005). However in that case the court found numerous "family, economic, and social ties" to the jurisdiction to support his pretrial release. Id. Defendant's case differs, since he has no ties to Pennsylvania as admitted above.

Because Defendant claims that all of his identifications are valid and can be explained, the Court will not credit the Government's assertions. However, the Court finds that Defendant was not forth-coming about his home addresses on his various drivers' licenses based on the following facts: Defendant's conviction in California for a false address on his license; Defendant's Indiana license listing a friend's address as Defendant's home address (whether or not Defendant had permission to either use the address or actually lived there); and Defendant's Colorado license listing a post office box as his home address, with the corresponding Colorado post office box application listing as Defendant's home address another post office box in California. (Govt's Resp. Def.'s Memo. 6-7.) This is further evidence of a lack of ties to any particular community

### 8.    Defendant's Use of False Aliases

The Government also claims that Defendant has previously used false aliases. In support of this claim, the Government offers several documents as exhibits to its Response brief. First, it offers a Gretna, Louisiana police report, which describes Defendant's actions when approached by police for trying to use a fake name at a business. (Govt's Resp. Def.'s Memo. Ex. A.) Defendant initially stated to the officers that his name was "John Smith." (Id.) He then admitted to being Kenneth Mitan when asked to produce identification. (Id.) Defendant subsequently was

-18-

arrested because of his outstanding warrant in Michigan.  Second, the Government offers an

application to the United States Postal Service for Delivery of Mail Through Agent (a post office

box in Redondo Beach, California) plus the mailbox service agreement.  (Govt's Resp. Def.'s

Memo. Ex. B.)  In the application, Defendant listed his own name but also authorized delivery of

mail to individuals named "John Smith" and "John Adams."  (Id.)  The government also alleges

that Defendant obtained this post office box using an expired U.S. passport and California

drivers' license containing false information.  (Id. at 7 n.2.)  Third, the Government offers a copy

of a Michigan driver's license, number M 350 465 603, in the name of "John Smith," which it

claims is a doctored version of a license issued to Kenneth Mitan.  (Id. Ex. C.)  The Government

claims that Defendant tried to use this license in an attempt to purchase a small business in

California in 2003 under the alias of John Smith.  (Id. at 12.)

Defendant admits using false aliases, but only for literary or business purposes, and never

to law enforcement or with a government agency.  (Hr'g Tr. 52:23-53:10, Jan. 30, 2009.)

Defendant denies that he told the Louisiana officer an alias.  (Id. at 55:2-3.)  He asserts that the

police report is ambiguous or potentially inaccurate and would like to have the officer involved,

Steven J. Klein, testify.  (Def.'s Reply 13.)  Defendant further asserts that he did not doctor the

Michigan driver's license and wishes to subpeona the license.  (Id. at 12, 14.)  Defendant does

not deny authorizing mail delivery to the above aliases.

The Louisiana police report and Application for Delivery of Mail Through an Agent to

the United States Postal Service are documents that speak for themselves and show that

Defendant has used aliases with law enforcement and a government agency, in direct

contradiction to his testimony.  The photocopied Exhibit submitted by the Government

purporting to show Defendant's doctored Michigan driver's license is too illegible to discern what it is, so the Court will not rely on this evidence.

9.    Defendant's Poor Record of Court Appearances in Michigan Bankruptcy

In addition to the instances of Defendant's failure to appear on criminal charges in Michigan and New Jersey as described above, Defendant failed to appear for scheduled dates in his long-running bankruptcy proceeding in Michigan.  In denying Defendant's request for a Chapter 7 discharge, the bankruptcy court stated that he "failed to appear for two regularly scheduled first meetings of creditors," even though the Trustee gave notice to Mitan at three separate addresses and to Mitan's counsel.  In re Kenneth M. Mitan, 03-br-71601 (Bankr. E.D. Mich. Sept. 29, 2005) (quoted in In re Mitan, 06-cv-15114, 2007 WL 1424225, at *1 (E.D. Mich. May 10, 2007)).  In addition, Defendant "turned over absolutely no documentation," as required by 11 U.S.C. § 521(a)(3).  Id.  The district court upheld the bankruptcy court's decision in part because Defendant's prior claim that he was incarcerated at the time of the creditors' meetings was false based on Defendant's new alleged dates of incarceration.  In re Mitan, 2007 WL 1424225, at *1.  In addition, the court found that Defendant failed to cooperate with the trustee by producing documents and did not have adequate justification for his failure to do so.  Id.

Defendant alleges that the 2005 bankruptcy order was reversed.  This is incorrect.  In 2006 the Sixth Circuit did reverse a February 9, 2004 order of the bankruptcy court converting Mitan's Chapter 11 filing to a Chapter 7 based on Defendant's father and creditor, Frank Mitan, receiving improper notice.  In re Mitan, 178 Fed.Appx. 503 (6th Cir. 2006).  However following the Sixth Circuit reversal, the bankruptcy court reinstated its conversion to Chapter 7 nunc pro tunc on October 25, 2006, with retroactive effect to the date of the original conversion, February

-20-

9, 2004.  The district court affirmed.  In re Mitan, 06-cv-15005, 371 B.R. 244 (E.D. Mich. June 4, 2007).  The bankruptcy court's nunc pro tunc order reinstated its 2005 order denying Defendant's discharge and containing the above-quoted language about Defendant's failure to appear and produce required documents.  That 2005 bankruptcy court order has been upheld by the federal district court on multiple grounds.  See In re Mitan, 06-cv-15114, 2007 WL 1424225 (E.D. Mich. May 10, 2007); In re Mitan, 06-cv-15115, 2007 WL 1452935 (E.D. Mich. May 10, 2007); In re Mitan, 06-cv-15116, 2007 WL 1452940 (E.D. Mich. May 10, 2007).  As noted by Defendant, he has appealed the district court's 2007 rulings, but the Sixth Circuit has not yet ruled on these appeals.

Defendant wishes to call Trustee Charles Taunt and Defendant's attorney Thomas Pavlik to testify regarding this case.  (Def.'s Reply 13.)

The bankruptcy court's decision detailing Defendant's failure to appear and failure to cooperate with his bankruptcy trustee speak for themselves, and the bankruptcy court was affirmed on appeal.  Further the district court determined that Defendant recanted his initial explanation for his failure to appear.  Such findings of fact are relevant to Defendant's record of prior court appearances and truthfulness with courts.

### 10. Pretrial Services Report

Finally, the Pretrial Services Report prepared in this case states that "defendant appears to pose a highly elevated risk of non-appearance."  The Report notes that defendant declined to provide information concerning his business, he has a significant history of foreign travel, his home address in Michigan is shared with his father and co-defendant, his criminal history lists known aliases used by defendant, and that defendant has two cases in fugitive status and three

open criminal matters.

     **B.**    **Defendant's Arguments**

Besides refuting each of the Government's arguments described above, Defendant advances several additional arguments.

Defendant argues as an initial matter that the government was not entitled to a detention hearing because it did not show the grounds for a detention hearing described in 18 U.S.C. § 3142(f)(1) or (f)(2).  Although Defendant did not commit a crime listed in § 3142(f)(1), the Government's Motion for Pretrial Detention contains numerous allegations and a supporting Declaration with exhibits that Defendant posed "a high risk of flight," consistent with § 3142 (f)(2)(A).  (Gov't's Mot. 1.)  Therefore, the Government demonstrated sufficient grounds for a hearing.

Defendant also argues that he was denied his procedural due process rights at his detention hearing to present evidence, testify, and cross-examine witnesses.  The detention hearing proceeded by proffer, as requested by Defendant and as allowed by § 3142(f).  Regardless of Defendant's argument, this Court's review of pretrial detention is de novo, so this Court will evaluate all of the assertions, briefs, and evidence on the Record and may hold an evidentiary hearing.  Therefore, Defendant's procedural arguments are not relevant to the Court's de novo review.

Finally, Defendant asserts several arguments in support of his release.  As noted above, Defendant argues that he has complied the terms of his Missouri bond order.  In addition, Defendant asserts that the facts that he self-surrendered following his indictment and appeared at his initial hearing in this case on December 23, 2008 are evidence that he his not a flight risk.

Finally, Defendant notes that the fact that he hired counsel, Judd Aaron, prior to his indictment indicates that he did not intend to flee from the charge.  Although this evidence supports Defendant's petition for release, it does not by itself establish that there is no risk of Defendant's flight.

> **C.**     **Assessment of the Evidence**

In light of all of the documents, allegations, and arguments produced by the Government and Defendant, this Court finds that it does not require an evidentiary hearing and that there is a serious risk that Defendant will flee if he is released pending trial.

Defendant has not adequately refuted, or described with specificity that he can refute, the Government's evidence to require an evidentiary hearing.  Defendant lists at least fifteen witnesses that he intends to call at a new evidentiary hearing on detention.  (Def.'s Memo. 26-30.)  Yet his description of their proposed testimony is non-specific, often irrelevant as described in the preceding discussion, and does not satisfactorily refute the Government's contentions.  For instance, as described above, Defendant wishes to call Scott Mandel to testify that he complied with his bond order in Michigan and therefore had permission to leave the state.  But Defendant's Michigan bond order applied solely during the appeal of his criminal conviction.  As such, this testimony does not refute the Government's evidence that Defendant was a fugitive from Michigan for over one year following the exhaustion of his appeal.  Defendant has offered no evidence to refute the fact that he was a fugitive after his appeal, except to assert baseless legal arguments about the effect of his bankruptcy filing.  In addition, the proposed testimony of at least six of Defendant's witnesses goes to Defendant's ultimate guilt or innocence in the alleged crimes in this case and in other criminal proceedings pending in other states.  This testimony is

not relevant to the pretrial detention factors listed in 18 U.S.C. § 3142(g).

The Court makes its determination that Defendant is a flight risk based on the history and characteristics of Defendant as described in § 3142(g)(3), specifically his prior record as a fugitive from the state of Michigan and disingenuous attempts to refute this record; his outstanding warrant in New Jersey; the fact that he was on release pending trial in Missouri at the time of his arrest in this case; his poor record of court appearances in his Michigan criminal case, his New Jersey criminal case, and his Michigan bankruptcy proceeding; his lack of ties to this community and his lack of strong ties to any particular community; and his past conduct with regards to the use of aliases, including with law enforcement and government agencies.  Based on these factors, the Court finds that  Defendant's overall record and behavior do not assure Defendant's appearance and preclude release on personal recognizance under § 3142(b).

In addition, the Court finds no condition or combination of conditions that will reasonably assure the appearance of Defendant as required by 18 U.S.C. § 3142(c).  The Record now before the Court shows that Defendant has no property or other surety that he could post as a bond or security.  At Defendant's January 30, 2009 hearing, he admitted to the Court that he has no assets.  (Hr'g Tr. 11:4-9, Jan. 30, 2009).  Defendant's statement to the Court that upon his release he would find a job sufficient to allow him to retain counsel in this complex fraud case is speculative and unsupported by any specific facts.  (Id. at 10:22-24).  The fact that Defendant does not have an existing residence in this district or nearby precludes his being placed on house arrest in a family setting, which is a possible condition that the Court has considered. Furthermore, the Defendant has no family in this district or nearby with whom he could reside or who can help assure his appearance at trial.  Based on this analysis, Defendant's pretrial

detention is required pursuant to § 3142(e).

In the papers accompanying Defendant's Reply brief, he expresses the willingness to be represented by counsel if the Court will grant an evidentiary hearing on his petition for release. (Def.'s Reply 5.)  The Court notes that it has assigned Ann Flannery, Esquire to serve as back-up counsel for Defendant under the Criminal Justice Act.  The Court encourages Defendant to consult with Ms. Flannery.

## V.    <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion to Release Defendant on Own Recognizance or in the Alternative for a De Novo Hearing is denied.  Defendant's related Motions are also denied.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| KENNETH MITAN. | : | NO. 08-760-1 |

## <u>ORDER</u>

AND NOW, this   6th      day of March, 2009, it is hereby ORDERED as follows:

(1)     Defendant Kenneth Mitan's Motion to Release Defendant on Own Recognizance

or in the Alternative for a De Novo Hearing (Doc. No. 51) and Memorandum in

Support of Request for Release or Evidentiary Hearing (Doc. No. 66) is DENIED;

(2)     Defendant's Motion to Strike Affidavit [sic] of Mark Fox (Doc. No. 47) is

DENIED because the Declaration's Exhibits are probative and reliable;

(3)     Defendant's Motion to Strike Evidence of Danger to Community (Doc. No. 48) is

DENIED as moot, since the Government no longer relies on this ground for

pretrial detention;

(4)     Defendant's Motion for Use-Fruits Immunity (Doc. No. 50) is DENIED as moot,

since this Court has determined that an evidentiary hearing on pretrial detention is

not necessary;

(5)     Defendant's Motion for Issuance of Subpoenas (Doc. No. 52) is DENIED as

moot, since this Court has determined that an evidentiary hearing on pretrial

detention is not necessary;

BY THE COURT:

/s Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\Criminal Cases\08-760 Mitan, us v\Mitan - Memo re pretrial detention 3-6-09.wpd