**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KENNETH MITAN, | : | NOs.  08-760-1 |
| FRANK MITAN, | : | 08-760-2 |

**MEMORANDUM**

Presently before this Court is Defendant Kenneth Mitan's Motion to Suppress (Doc. No.

110), which was joined by Defendant Frank Mitan (hereinafter referred to as Kenneth and

Frank).  The Motion concerns evidence seized by the Redondo Police Department on January 12,

2005, from a car driven by Kenneth, following his arrest.  The Court held a two-day evidentiary

hearing on the Motion at which the Government's witness, Redondo Beach Police Detective

Michael Strosnider, presented lengthy testimony.  Based on the extensive post-hearing briefs and

the following analysis, Defendants' Motion is GRANTED in part and DENIED in part.

**I.      Factual Background**

The facts presented below come largely from the testimony of the Government's sole

witness, Detective Strosnider, at this Court's evidentiary hearing on May 6 and 7, 2009.  Because

the Court found the witness to be generally credible, the Court finds facts based on his testimony,

with any inconsistencies as noted.

As a preliminary matter, it should be noted that none of the evidence in question in this

Motion relates to the specific alleged criminal conduct for which Defendants were indicted.  The

seizure of this evidence occurred nearly six months prior to the commencement of the alleged

criminal activity described in the Indictment.  However the Government seeks to introduce this

evidence under Federal Rule of Evidence 404(b).

      **A.**     **Investigation Prior to the Day of Arrest**

In January 2005, Detective Strosnider of the Redondo Beach Police Department was contacted by an American Express representative about a possible fraudulent corporate business account in the name of Prime-Line, Inc.  (Hr'g Tr. 32:16-19, May 6, 2009.)  On January 6, 2005, American Express faxed to Strosnider the application for a corporate card for Prime-Line Inc. (Hr'g Ex. G-1, May 6.)  The application was signed by "Frank Mitan," and his title was listed as "CEO."  (Id. at USA039648-49.)  The contact name on the application was "John Smith"[1]  (Id. at USA039648), and both "Kenneth Mitan" and "Frank Mitan" had applied to receive employee cards (Id. at USA039649-50).  A "Rush Card Request" form was included in the fax, requesting that the cards be sent to Frank Mitan of Prime-Line Inc. at a mail box in Redondo Beach, California.  (Id. at USA039653).  During the course of his investigation, Detective Strosnider learned that a John Smith had contacted American Express several times regarding the status of the application and the rush request, that Kenneth Mitan went by the name John Smith sometimes, and that Kenneth was part of several attempted business transactions on behalf of his father that were involved in legal disputes.  (Hr'g Tr. 33:12-16, 34:3-7, May 6.)  American Express also informed Strosnider that Kenneth and Frank were connected to several other "accounts that were never paid, and ultimately they determined on their end that those were fraudulent accounts." (Hr'g Tr. 67:13-15, May 7, 2009.)  These accounts were mainly for business and resulted in a $325,000 loss to American Express.  (Hr'g Tr. 36:8-17, May 6; Hr'g

---

[1]John Smith is a known alias of Kenneth Mitan.  (See Mem. re: Mot. Release, Doc. No. 91, Mar. 6, 2009, 18-20.)

Tr. 67:18-21, May 7.)  In addition, Strosnider obtained information about Kenneth from an

internet website mitanalert.com, which alleged additional small business fraud by Kenneth.[2]

(Hr'g Tr. 34:8-10, May 6.)

Strosnider investigated Prime-Line, Inc. by contacting the person he knew to be the

owner, Doug Feeney, who informed Strosnider that neither Kenneth Mitan nor John Smith

owned the company nor had permission to apply for a corporate credit card.  (Hr'g Tr. 36:22-

37:4, 57:5-21, May 6.)  In subsequent conversations prior to Kenneth's arrest, Strosnider learned

that there had been a sale of the company and that Feeney and Kenneth were involved in a civil

dispute over ownership of the company.  (Hr'g Tr. 57:24-58:3, May 6.)  Strosnider did not

investigate the civil dispute further.  (Hr'g Tr. 59:4-12, May 6.)  Feeney's name did not appear

anywhere on the American Express application received by Strosnider.  (Hr'g Tr. 32:20-24, May

7.)  Strosnider testified that on the day of Kenneth's arrest he believed Mr. Feeney to be the

President of Prime-Line, Inc.  (Hr'g Tr. 37:21-24, May 7.)

According to the Rush Card Request form, the credit cards were to be delievered to 409

N. Pacific Coast, #755, Redondo Beach, CA.  (Hr'g Ex. G-1 USA039653.)  This address

corresponds to a UPS Store where Kenneth held Box 755.  (Hr'g Ex. G-2 USA039665.)  The

application form for Box 755 authorized restricted delivery mail for the following individuals:

John Smith, Kenneth Mitan, John Adams.  (Id.)  Strosnider reviewed the UPS Store application

form for Box 755 prior to his arrest of Kenneth.  (Hr'g Tr. 38:11-13, May 6.)

Based on the above information, Strosnider, with American Express investigators, set up

---

[2]Kenneth claims that the website has subsequently been removed from the internet by
court order as defamatory.

a controlled delivery of the Prime-Line credit cards to the address requested. (Hr'g Tr. 38:19-24, May 6.) He contacted the UPS Store where the cards were to be delivered and informed them of the investigation. (Hr'g Tr. 39:2-6, May 6.)

      **B.     Events Leading Up to Arrest and the Arrest**

On January 12, 2005, the day of the controlled delivery, Strosnider received a phone call from the UPS Store around 10 a.m. advising him that someone was there to pick up a package for Box 755. (Hr'g Tr. 39:13-15, May 6.) Strosnider, along with approximately five undercover officers in separate vehicles, responded to the UPS Store. (Hr'g Tr. 39:17-20, 61:8-16, May 6.) Strosnider entered the UPS Store acting as an employee, and observed Kenneth—who he identified from viewing prior photos—outside. (Hr'g Tr. 39:23-40:4, May 6.) Strosnider then observed Kenneth walk inside and ask for the package, appearing nervous and anxious. (Hr'g Tr. 40:4-8, May 6.) Kenneth picked up the package and signed for it, signing "Frank Mitan" on the signature form. (Hr'g Tr. 40:14-17, May 6.) The package was an 11 inch by 14 inch envelope with a UPS insignia. (Hr'g Tr. 59:23-25, May 6.) Kenneth immediately opened the envelope and appeared to grab a smaller envelope from inside as he was walking out of the store. (Hr'g Tr. 40:19-22, May 6.) Based on his observations at the UPS Store and information from American Express, Strosnider believed that the package contained the Prime-Line credit cards. (Hr'g Tr. 66:19-21, May 6.) Strosnider radioed his fellow officers in the parking lot that Mitan was exiting the store with the package. (Hr'g Tr. 40:24-25, May 6.) Strosnider than saw Kenneth enter an unoccupied, white, four-door, 2002 Chrysler Concorde with Michigan plates. (Hr'g Tr. 41:16-20, May 6.) The police later learned that the car was registered to Frank Mitan, Kenneth's father, with an address in Farmington Hills, Michigan. (Hr'g Ex. G-4 USA039637.)

-4-

Strosnider and the other officers followed Kenneth as he drove north on the Pacific Coast Highway to Hermosa Beach, where Kenneth stopped at a cell phone store, Virtually Wireless. (Hr'g Tr. 42:21-24, 43:5-9, May 6.)  According to Strosnider's Investigation Follow-Up Report, it appeared that Kenneth was on a cell phone prior to arriving at Virtually Wireless, and it was later determined that he was activating the credit cards.  (Hr'g Ex. D-1 USA0390617.)  Kenneth entered the store and exited fifteen to twenty minutes later.  (Hr'g Tr. 43:12-14, May 6.) Strosnider was in touch with American Express investigators at the time, who were monitoring the credit card charges.[3]  (Hr'g Tr. 43:18-20, May 6.)  At or near the time of the transaction and prior to Kenneth's arrest, American Express advised Strosnider that Kenneth used one of the Prime-Line cards at Virtually Wireless to purchase items worth $108.25.  (Hr'g Tr. 43:20-22, 64:5-6, 64:14-17, May 6.)  After Kenneth exited the store, Strosnider observed him holding a bag and then re-entering his vehicle.  (Hr'g Tr. 43:25-44:2, May 6.)  Based on the amount charged and his observations, Strosnider believed that Kenneth purchased a cell phone.  (Hr'g Tr. 49:22-50:12, May 7.)

Kenneth continued to drive north and then stopped at a Kinko's copy store in El Segundo. (Hr'g Tr. 44:1-7, May 6.)  Strosnider observed Kenneth exit his vehicle, enter Kinko's, and then exit Kinko's empty-handed approximately fifteen minutes later.  (Hr'g Tr. 44:10-12, 68:15-17, May 6.)  American Express did not advise Strosnider of any charges made at Kinko's.  (Hr'g Tr. 68:18-22, May 6.)  Strosnider does not recall that he observed Kenneth going into his trunk at

---

[3]Strosnider initially testified that he was in "constant contact" with American Express investigators.  (Hr'g Tr. 43:18, May 6.)  On cross-examination, Strosnider admitted that he "spoke to them several times."  (Hr'g Tr. 70:14, May 6.)  Although Frank argues that this is an inconsistency in Strosnider's testimony, the Court does not regard it as a material inconsistency.

any time during the surveillance.  (Hr'g Tr. 62:23-25, 63:15-16, 68:23-69:1, May 6.)

Kenneth next drove to a parking lot for the Los Angeles International Airport and parked his car.  (Hr'g Tr. 44:14-16, 45:2-3, May 6.)  Around that time and prior to Kenneth's arrest, Strosnider learned from American Express that Kenneth had used one of the credit cards to purchase a plane ticket from Los Angeles to Georgia.  (Hr'g Tr. 44:20-24, 69:2-7, May 6.)

At this point, Strosnider "formed the opinion that Mr. Mitan had fraudulently obtained corporate American Express credit cards, used them at a cell phone store and also purchased a plane ticket.  Therefore, I advised the other officers to detain him pending further investigation." (Hr'g Tr. 45:5-8, May 6.)  This opinion was based on all the information he had obtained prior to the arrest, the information from American Express, Kenneth and Frank's names being associated with other fraudulent accounts that American Express had given him, the information from Prime-Line's owner, and the possible allegations on the mitanalert website.  (Hr'g Tr. 71:9-14, May 6.)  The other officers detained Kenneth for the Prime-Line credit-card fraud at approximately 11:44 a.m.  (Hr'g Tr. 71:23-25, 89:23-25, May 6; Ex. D-3.)

Strosnider was in his car a short distance away when the other officers detained Kenneth; he arrived at the lot within a minute or two of him being detained.[4]  (Hr'g Tr. 45:10-20, 70:23-24, May 6.)  When he arrived, he observed that Kenneth was standing next to his vehicle with the other officers standing near him.  (Hr'g Tr. 45:16-18, May 6.)  Strosnider does not remember if Kenneth was handcuffed, but Strosnider testified that Kenneth was not free to leave.  (Hr'g Tr.

---

[4]Kenneth argues that Strosnider did not arrive until 12:00 p.m., according to Officer Freeman's Supplemental Report (Hr'g Ex. D-4), so Strosnider's testimony about this is false. (Kenneth Mitan's Br. Support Mot. Suppress 10-11.)  However, the Court found Strosnider credible on this point and understands Officer Freeman's Report to be an approximation.

73:24-74:3, May 6.)  The arrestee identified himself to Strosnider as Kenneth Mitan but said that

he was trying to change his name to John Adam Smith.  (Hr'g Tr. 52:8-9, May 6; Hr'g Tr. 58:12-

19, May 7.)  The two Prime-Line corporate credit cards were found on Kenneth's person at the

time of the arrest.  (Hr'g Tr. 66:19-24, 68:1-2, May 6; Ex. G-5; Ex. D-2.)  Kenneth was booked

for the following charges under the California Penal Code: § 530.5(a), improper use of personal

identifying information, and § 484g(b), credit card theft misrepresentation.  (Hr'g Tr. 21:5-9,

May 7; Ex. D-3.)

### C.    Events at Airport Lot Following Kenneth Mitan's Arrest, Relevant for Search and Seizure Issues

After Strosnider arrived at the airport lot and observed that Kenneth was detained, he

conducted a visual search of the car's interior.  (Hr'g Tr. 45:22-23, May 6.)  During his visual

search, he observed the cell phone store bag in the front passenger area of the vehicle.  (Hr'g Tr.

46:1-3, May 6.)  He also observed loose papers and documents with business names and various

addresses in both the front passenger area and the back seat, a laptop in the back seat, trash, and

newspapers.  (Hr'g Tr. 46:3-7, May 6.)

Following his visual search, Strosnider entered the vehicle to recover the cell phone store

bag because he believed this to be fraudulently obtained.  (Hr'g Tr. 66:2-4, May 6.)  He also

believed other documents related to Prime-Line may have been in the car.  (Hr'g Tr. 10:3-9, May

7.)  Strosnider was not aware of whether Kenneth had been asked to consent to the search and did

not recall if the car was locked (Hr'g Tr. 75:15-21, 76:19-21, May 6); however he was not under

the impression that it was a consent search (Hr'g Tr. 80:6-13, May 6).  In the cell phone store bag

he found a box and a completed application from the cell phone store.  (Hr'g Tr. 46:9-16, May

6.)  The application contained the business name B&B Concrete, which was not the company that Strosnider was investigating.  (Hr'g Tr. 46:16-19, May 6.)  Strosnider testified that he believed he may have taken the bag from the vehicle at that time.  (Hr'g Tr. 79:5-6, May 6.)

Upon searching the vehicle, Strosnider observed other loose papers in the car, including papers with signatures, dates, business names, and business information; escrow papers; bank records; and business bank statements.  (Hr'g Tr. 46:21-24, 52:23-25, May 6.)  However Strosnider testified that he did not recognize the company names on the papers.  (Hr'g Tr. 81:5-10, May 6.)  Strosnider moved some documents around to determine their validity but left these inside the car.  (Hr'g Tr. 52:21-22, 79:6-7, May 6.)  According to Strosnider, "based on the volume of them, it needed to be examined later to determine if I had any Prime-Line information inside."  (Hr'g Tr. 46:21-24, May 6.)  Strosnider then used Kenneth's key to open and visually search the trunk "to determine if there was any further evidence that could be connected that should be immediately removed.  (Hr'g Tr. 46:23-24, 47:2-3, 66:10-22, May 6.)  In the trunk, Strosnider observed "the same type of paperwork in volume."  (Hr'g Tr. 47:12-13, May 6.)  He testified that he moved some things around to look at the documents.  (Hr'g Tr. 74:4-8, May 7.)  Strosnider does not recall removing documents or anything else besides the cell phone bag from the car at the airport parking lot.  (Hr'g Tr. 53:3-7, 84:18-22, May 6.)

Initially Strosnider testified that the purpose of the search was for evidence because he was "recovering documents and/or paperwork I believe connected to this case."  (Hr'g Tr. 82:18-20, May 6.)  However, on re-direct, Strosnider also testified that one of the purposes of his visual search of the trunk was a safety search, "to make sure there was nothing in there that could be harmful during the towing process."  (Hr'g Tr. 66:12-14, May 7.)  Strosnider then testified that

this safety search was part of an initial inventory search.  (Hr'g Tr. 66:23-67:2, May 7.)  On re-

cross, Strosnider clarified the purpose of the airport parking lot search:

> A:     It was a two-part search.  First a quick evidence recovery search for the
> evidence that's related to this case, and a—the beginning portion of an
> inventory search to make sure that the vehicle was safe to be towed and it
> was not going to harm anyway [sic].  There was nothing inside that could
> harm officers and/or other citizens.
>
> Q:     Now you said that there was—this search was conducted also for safety, is
> that correct?
>
> A:     Correct.

(Hr'g Tr. 71:19-72:2, May 7.)  Strosnider testified that he had no reason to believe Mitan was

armed and dangerous or that the car contained weapons.  (Hr'g Tr. 72:3-20, May 7.)

After Strosnider's visual search, Kenneth was placed in a police vehicle.  (Hr'g Tr. 48:7-

8, May 6.)  Strosnider continued "the processing" of the vehicle.  (Hr'g Tr. 48:10, May 6.)  Based

on the amount of documents in the vehicle, Strosnider was concerned about the parking lot being

an "uncontrolled environment," so he requested a tow truck to respond to the airport lot to tow

Kenneth's car.  (Hr'g Tr. 48:13-16, 82:21, May 6.)  Strosnider testified that he was concerned

about the following: (1) not wanting to leave the vehicle in the parking lot where it could be

damaged, (2) believing that the documents inside could be "related to my investigation or further

investigative leads," and (3) not wanting the registered owner of the car to show up and take the

vehicle and / or its contents.  (Hr'g Tr. 48:19-49:1, May 6.)  As such, Strosnider had the local

tow company tow the car to the Redondo Beach Police Department Detective Bureau parking lot.

(Hr'g Tr. 49:3-4, May 6.)  An officer followed the car as it was towed to the Department lot.

(Hr'g Tr. 68:1-2, May 7.)

Prior to the car being towed, Strosnider testified that Officer Martin began filling out

California Highway Patrol (CHP) Form 180: Vehicle Report, including the section entitled

"Vehicle Contents."  (Hr'g Tr. 50:21-24, 51:20-22, 87:20-24, May 6; Hr'g Tr. 4:22-23, May 7.)

The following items were listed as vehicle contents: "(1) several miscellaneous junk items

(newspapers, coat hangers, trash, boxes), (2) miscellaneous clothing items, (3) two DVDs

(Timeline / Master Commander)."  (Hr'g Ex. G-4 USA039638.)  The form did not list the cell

phone, documents, or laptop that were later recovered from the vehicle.  (Hr'g Tr. 4:3-11, May

7.)  Strosnider testified that he did not know why additional items were not listed on the form.

(Hr'g Tr. 4:18-23, May 7.)  Officer Martin initially listed California Vehicle Code 22651(h) as

the "Storage Authority" code.[5]  (Hr'g Ex. G-4 USA039637.)  Section 22651(h) states that a

police officer may remove a vehicle "[w]hen an officer arrests a person driving or in control of a

vehicle for an alleged offense and the officer is . . . required or permitted to take, and does take,

the person into custody."  Cal. Veh. Code § 22651(h) (2009).  However Strosnider later crossed

this out and wrote in 22655.5.  (Hr'g Tr. 51:9-10, May 6.)  Section 22655.5 states that an officer

may impound a vehicle when "a peace officer has probable cause to believe that the vehicle is

itself evidence which tends to show that a crime has been committed or that the vehicle contains

evidence, which cannot readily be removed, which tends to show that a crime has been

committed."  Cal. Veh. Code § 22655.5 (2009).  Strosnider changed the Code because, "based on

the totality of my investigation, I believed that Mr. Mitan used that vehicle as a means to pick up

fraudulently obtained corporate American Express credit cards."  (Hr'g Tr. 51:13-16, May 6.)

---

[5]Defendants argue that Form 180 is not reliable based on discrepancies between the
version of the form introduced by the Government as an exhibit during the evidentiary hearing
and two versions subpoenaed from Frank Scotto Tow Yard.  The discrepancies and the Court's
discussion of the impact of these discrepancies is discussed infra, Part V.C, D.

### D.      Continuation of Car Search at Police Station

_____After Kenneth's vehicle was towed to the Detective Bureau, Strosnider conducted an evidence search of the interior and trunk area and recovered documents from the vehicle.[6]  (Hr'g Tr. 49:9-11, May 6.)  Strosnider testified that at this point he believed "subjects involved in this type of matter are involved in several different cases" (Hr'g Tr. 94:5, May 6), and he was looking for "further investigative leads" (Hr'g Tr. 94:5, May 6).  Therefore if something was found in plain sight or during recovery of the documents, it was seized; the search was not limited to contraband associated with the crime for which Mitan was arrested.  (Hr'g Tr. 94:8-9, May 6.)  Strosnider's search consisted of taking paperwork out of the vehicle and putting it into boxes "based on the volume of what was inside."  (Hr'g Tr. 97:17-18, May 6.)  He estimated that the papers filled seven or more boxes.  (Hr'g Tr. 98:5-7, May 6.)  No document was created listing either the pieces of paper recovered from the vehicle or the boxes containing the paperwork.  (Hr'g Tr. 94:23-24, 97:19-20, May 6.)  The only list of the vehicle's contents was the three-item list on CHP Form 180.  (Hr'g Tr. 97:2-4, May 6.)  Therefore, no record was made of from where in the vehicle, e.g. passenger compartment versus trunk, the various documents were recovered.  (Hr'g Tr. 4:6-13, May 7.)

At the evidentiary hearing, counsel for Defendant Frank Mitan questioned Strosnider

---

[6]CHP Form 180 has a signature line for the "Garage Principal / Agent Storing Vehicle," which was signed by B. Coates, 1/12/05, 12:05.  (Hr'g Ex. G-4 USA039637.)  Strosnider testified that the tow truck driver signed this at the time he picked up the car at the airport lot, not at the time the lot received the vehicle.  (Hr'g Tr. 90:16-17, 91:22-24, May 6.)  Frank argues that based on this and other documentary evidence, the vehicle was in fact towed to the Frank Scotto Tow Yard initially, and not to the Redondo Beach Police Department.  (Def. Frank Mitan's Br. 9-10.)  However the Court finds Strosnider to be credible that the vehicle was initially towed to the police department and accepts his explanation that Form 180 was signed at pick-up.

repeatedly about the procedures of the Redondo Beach Police Department for conducting evidence and inventory searches.  Strosnider replied: "Well, when searching a vehicle we conduct a systematic search, during an evidence search and an inventory search, look throughout the vehicle for evidence and/or contraband connected to the case."  (Hr'g Tr. 98:11-14, May 6.)  The Police Department had a general orders manual that details different procedures within the Department.  (Hr'g, 14:1-2, May 7, 2009.)  Strosnider believed this manual covered evidence, inventory, and automobile search procedures.  (Hr'g, 14:8-14, May 7, 2009.)  Defendants subpoenaed this manual following the hearing.  (See Def. Kenneth Mitan's Br. Support Mot. Suppress Ex. H.)  Strosnider also testified to being trained in search and seizure.  (Hr'g Tr. 14:15-17, May 7.)  Under police procedures, when evidence is booked into the Redondo Beach Police Department Property Unit, the Department has forms to fill out, the property receives a log number, and it is placed into a locker.  (Hr'g Tr. 15:18-20, 16:13-17, May 7.)

However, the documents, laptop, and other items recovered from the car were not booked into the Property Unit.  Instead, the boxes of evidence were put into Sergeant Grimm's secured office.  (Hr'g Tr. 19:1-4, 23:10-12, May 7.)  By contrast, the items recovered from Mitan's person—the two American Express cards, a Bank One Credit Card in the name of "John Smith," a Kinko's card in the name of "John Smith," a BP business card for "B/B Concrete Inc.," a Western Union card for "Kenneth Milton" [sic], and miscellaneous papers / business cards / photographs—were booked into evidence.  (Hr'g Tr. 18:23-25, May 7.)  Strosnider later helped carry the boxes back out when they were requested by a bankruptcy trustee in the Eastern District of Michigan related to Kenneth's bankruptcy filing there.  (Hr'g Tr. 18:5-10, 19:18-20, May 7.)  Strosnider did not recall any forms being signed when the evidence was turned over to the

-12-

trustee.  (Hr'g Tr. 20:12-17, May 7.)  The boxes were later turned over to the FBI pursuant to a grand jury subpoena.  (Hr'g Tr. 18:8-10.)

Finally, an inventory search of the car was done for final impound.  (Hr'g Tr. 49:15-16, May 6.)  Strosnider testified that under Redondo Beach Police procedures, towed vehicles are impounded and stored at a local towing company, Frank Scotto Tow in Torrance, California. (Hr'g Tr. 49:18-22, May 6.)  Strosnider testified that the Redondo Beach Police Department had a standard procedure for impounding and a standard procedure for doing inventory searches. (Hr'g Tr. 49:23-50:3, May 6.)  The standard process for inventory search and impounding is to complete a CHP Form 180 and do a thorough examination of the interior and exterior of the car, including checking for anything that could be harmful to the officers and / or tow company personnel.  (Hr'g Tr. 50:5-12, May 6.)

Strosnider does not recall and no record was made of when the vehicle was towed to Frank Scotto's Tow Yard.  (Hr'g Tr. 10:3-9, May 7.)  No additional CHP Form 180 was generated.  (Hr'g Tr. 62:19-22, May 7.)  Strosnider's Investigation Follow-Up Report states, "His vehicle and all contents were held as evidence and stored at Frank Scotto Tow for investigation." (Hr'g Ex. D-1 USA039621.)

## II.   Procedural History

Defendants Kenneth Mitan, Frank Mitan, Bruce Atherton, and Charro Pankratz were indicted on December 18, 2008 (Doc. No. 1).  Defendants Kenneth and Frank were indicted on five counts: conspiracy to commit wire and mail fraud (Count I), two counts of mail fraud (Counts II - III), and two counts of wire fraud (Counts IV - V).  Kenneth was also indicted on a sixth count: use of a false name in a fraud scheme (Count VI).  Defendants Atherton and

Pankratz were indicted on the conspiracy count (Count I).  The Government added a perjury charge against Kenneth (Count VII) in the Superseding Indictment filed April 23, 2009 (Doc. No. 133). Defendants are accused of defrauding four small businesses using a fraudulent scheme. (Superseding Indictment ¶¶ 1, 13-16.)  The scheme involved approaching the business under false pretenses, negotiating to buy the business, not paying the full amount of money due under the contract at closing, taking control of the business, and diverting its cash and accounts receivable for purposes other than the maintenance of the business.  (Id. ¶¶ 8-12.)

Defendants Frank Mitan, Atherton, and Pankratz were released on bail after hearings by Magistrate Judge Caracappa on December 24, 2008 (Doc. Nos. 12, 15, 18).  Kennth Mitan was detained pre-trial per Order by Magistrate Judge Strawbridge issued January 7, 2009 (Doc. No. 24).  On January 8, 2009, Kenneth's attorney filed a Motion to Withdraw (Doc. No. 25), and Mitan filed a Motion to be Appointed Pro Se on January 13, 2009 (Doc. No. 29).  At a hearing held January 30, 2009, this Court approved Kenneth to proceed pro se (Doc. No. 58).  Kenneth has continued to proceed pro se; however this Court appointed stand-by counsel, Ann Flannery, Esq., for Kenneth on March 6, 2009 (Doc. No. 89).  The other three Defendants are represented by counsel.

Kenneth has filed numerous pre-trial motions.  He filed the Motion to Suppress at issue in this Memorandum on March 31, 2009 (Doc. No. 110).  On April 27, 2009, Frank filed a Motion for Joinder to the Motion to Suppress (Doc. No. 134).  On April 28, 2009, the Government responded to Kenneth's Motion to Suppress (Doc. No. 139).  The Court granted Frank's Motion for Joinder on May 6, 2009 (Doc. No. 173).

On May 6 and 7, 2009, this Court held an evidentiary hearing on the Motion to Suppress

-14-

with testimony from the Government's witness, Detective Strosnider (Doc. Nos. 169-72).  At the

hearing and in a post-hearing scheduling order, the Court granted certain subpoena requests of

the Defendants and set a schedule for additional briefing (Doc. No. 180).  Frank filed a brief in

support of the Motion to Suppress on June 12, 2009 (Doc. Nos. 213-14).  Kenneth filed an

additional brief in support of his Motion on June 16, 2009 (Doc. No. 219).  The Government

responded on June 22, 2009 (Doc. No. 220).  Kenneth filed a reply on July 7, 2009 (Doc. No.

230).  On June 30, 2009, Kenneth had filed a Motion to Compel a copy of the Government's

Response, claiming he had never received it (Doc. No. 223).  However the Motion to Compel is

now moot based on Mitan's July 7 Reply, which directly replies to the Government's Response.

On April 28, 2009, the Government filed a Motion In Limine (Doc. No. 138) to admit

certain character evidence under Rule 404(b), including the evidence seized in Redondo Beach

on January 12, 2005, which is the subject of this Motion to Suppress.  The necessity of

addressing that Motion as to the Redondo Beach evidence turns on the outcome of this Motion to

Suppress.

## III.   **Parties' Contentions**

### A.   **Defendant Kenneth Mitan's Contentions**

In Kenneth's initial Motion to Suppress, he first argues that police lacked probable cause

in arresting him without a warrant on January 12, 2005.  Kenneth further argues that the

warrantless seizure of eleven boxes of documents and the laptop was unconstitutional because

the search and seizure was not incident to his arrest.  Specifically Kenneth argues that since he

was under arrest at the time of the search and most of the search and seizure occurred after the

car was towed to the police department, the search was too remote to fall under the incident to

arrest warrant exception.

Kenneth raises additional factual and legal arguments in his supporting brief filed after the evidentiary hearing and in response to the Government's specific warrant exceptions arguments.  First, Kenneth repeats his initial argument that there was no probable cause to arrest him because Strosnider had evidence that the ownership of Prime-Line was disputed.  Second, Kenneth asserts that based on CHP Form 180, the vehicle was towed for storage under California Vehicle Code § 22651(h) and not impounded for evidence.  Further, Kenneth claims that § 22651(h) does not apply since he was no longer in the vehicle, and therefore the seizure and subsequent search of the vehicle were unlawful.  Third, Kenneth argues that the Government altered the version of CHP Form 180 that it presented at the evidentiary hearing to hide the fact that the form was originally marked as "Stored" instead of "Impounded."  Fourth, Kenneth claims that Government documents conflict with Strosnider's testimony about the time Strosnider arrived at the site of arrest.

As to his legal arguments, as a fifth point, Kenneth asserts that under the applicable, more stringent California standard for search and seizure, the search of the trunk was unlawful.  Sixth, Mitan argues that the police's broader "investigatory search," beyond evidence of the offense of arrest, was unconstitutional.  Seventh, Kenneth argues that the Redondo Beach Police violated their own policies and procedures by failing to log any of the evidence removed from the car. Eighth, Kenneth contends that the post-tow search of the vehicle was unlawful because the search was not incident to arrest, it constituted a search for evidence beyond the offense of arrest, and for all of the other arguments already presented.  Additionally, Kenneth notes that some of the documents allegedly retrieved from the car are dated after the date that they were seized.

Ninth, Kenneth argues that none of the other warrant exceptions apply: the plain view exception does not apply because the evidence in the vehicle was not immediately incriminating; the automobile exception does not apply because there was no danger that the vehicle would be moved before a warrant could be obtained; and the inevitable discovery exception does not apply because the car was towed for storage, not evidence, so no inventory would have occurred.

Kenneth's Reply to the Government's Sur-Response further refutes the documents and testimony that the Government relies on and develops his legal arguments as to the automobile exception, plain view exception, and inevitable discovery exception in greater detail.

### B.  Defendant Frank Mitan's Contentions

Frank raises similar arguments as those raised by Kenneth.  First, Frank argues that there was insufficient probable cause to arrest Kenneth because the allegations were unsubstantiated and Strosnider knew of the civil dispute over ownership of Prime-Line.  Second, Frank asserts that the search incident to Kenneth's arrest exceeded the scope recently laid out by the Supreme Court to the extent that it included evidence beyond evidence of the credit card fraud.  Third, Frank argues that the automobile exception does not apply because there was no probable cause of any crime beyond the Prime-Line credit card fraud.  Fourth, Frank contends that the search was not a safety search since there was no evidence that Kenneth was armed or dangerous.  Fifth, Frank asserts that it was not an inventory search because Strosnider originally denied doing an inventory search at all and because there was no inventory created, pursuant to procedures or otherwise.  Finally, Frank argues that serious inconsistencies as to various versions of CHP Form 180 and discrepancies as to the dates of documents seized and the date of arrest call into question the integrity of the Government's evidence as a whole.

_____**C.**      **Government's Response and Sur-Response**

In its initial Response to Kenneth's Motion, prior to the evidentiary hearing, the Government argued that the evidence seized from the vehicle was permissible under two exceptions, the automobile exception and the inevitable discovery exception.  First, the Government argued that under the automobile exception, the search was permissible without a warrant since the police had probable cause that the vehicle contained evidence, based on prior information and their observations on the day of the arrest.  Second, the Government claimed that the evidence would have been inevitably discovered through a lawful inventory search after impoundment of the vehicle, which is the standard practice of the Redondo Beach Police.

The Government's Sur-Response continues to rely on the automobile and inevitable discovery arguments and adds additional arguments.  First, the Government maintains that there was probable cause to arrest Kenneth based on Strosnider's extensive investigation and observations on the day of arrest.  Second, the Government expands on its automobile exception argument by asserting that there was probable cause at the time of the arrest that the vehicle itself was evidence and that Strosnider's visual inspection established probable cause to search the entire contents of the vehicle.  Further, the Government cites caselaw that a search pursuant to the automobile exception does not have to be contemporaneous with the seizure of the vehicle.  Third, the Government relies on the inevitable discovery exception to argue that Redondo Beach procedures required the vehicle to be towed and an inventory performed even if the evidence search had not occurred.  Fourth, the Government asserts the plain view exception, since Strosnider observed evidence of Mitan's cell phone purchase as well as voluminous business-related documents and a laptop from outside the vehicle.  Finally the Government offers a proffer

as to the discrepancies in the various versions of CHP Form 180.

## IV. Legal Standard

### A. Warrantless Arrests

Warrantless arrests are consistent with the Fourth Amendment if there is probable cause that an offense is being or has been committed.  Devenpeck v. Alford, 543 U.S. 146, 152 (2004). The alleged invalidity of an arrest under state law should not be conflated with its federal constitutional reasonableness.  See Virginia v. Moore, 128 S.Ct. 1598 (2008) (upholding an arrest supported by probable cause even though it was made in violation of state law). "[P]robable cause for a warrantless arrest exists when, at the time of the arrest, the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Glasser, 750 F.2d 1197, 1205 (3d Cir. 1984) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  A court should assess whether probable cause existed "at the moment the arrest was made."  Snell v. City of York, Penn., 564 F.3d 659, 671 (2009) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  "Mere suspicion" is insufficient to sustain a warrantless arrest.  Snell, 564 F.3d at 671 (quoting United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002)).

### B. Warrantless Searches and Seizures of Physical Evidence

A motion to suppress physical evidence is based on the protection against "unreasonable search and seizure" contained in the Fourth Amendment.  U.S. Const. amend. IV.  The basic rule of this protection is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  Arizona v. Gant, 129 S.Ct. 1710,

-19-

1716 (2009) (quoting Katz v. United States, 389 U.S. 347, 357  (1967)).  The parties argue about the applicability of several of these exceptions—the incident to arrest exception, the automobile exception, the inevitable discovery exception, and the plain view exception—each of which is discussed below.  Contrary to Kenneth's argument, California search and seizure law does not apply to this Court's analysis.  See California v. Greenwood, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.")  Furthermore, violations of local police procedure, standing alone, are not necessarily constitutional violations.  Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 127 (3d Cir. 2003).

**V.     Discussion**

      **A.     Probable Cause to Arrest Kenneth Mitan**

Defendants argue as an initial matter that there was no probable cause to arrest Kenneth on January 12, 2005.  The Court rejects this argument.  Beginning with Strosnider's initial contact with American Express in early January through his observations on January 12 of Kenneth picking up and making charges on the allegedly fraudulent credit cards, Strosnider developed ample knowledge to warrant a reasonable officer's belief that an offense was being committed.  These events include learning from American Express that Kenneth was involved in opening a possible fraudulent account in the name of Prime-Line; receiving the fax from American Express containing the allegedly fraudulent credit application and rush card request filled out with the names Kenneth Mitan, Frank Mitan, and John Smith; learning that the Mitans had other unpaid accounts with American Express; reviewing the allegations on the mitanalert

website; contacting Doug Feeney and learning that Kenneth did not have authorization to apply for a corporate credit card in the name of Prime-Line; learning that the credit cards were to be delivered to a post office box rented by Kenneth; observing Kenneth pick up and sign his father's name for the credit card package at the UPS store looking nervous and anxious; observing Kenneth enter Virtually Wireless and exist with a shopping bag; learning from American Express that the Prime-Line credit card was used to make a purchase at Virtually Wireless; observing Kenneth drive to a parking lot near the Los Angeles airport; and learning from American Express that a Prime-Line credit card was used to purchase an airplane ticket. American Express was a reliable and trustworthy source of information as to credit card fraud, and Strosnider conducted further inquiries that confirmed their claims. The totality of this information leads to a reasonable belief that Kenneth had acquired credit cards fraudulently and then used them to make purchases.

Defendants argue that Strosnider had knowledge and evidence of Prime-Line, Inc.'s disputed ownership, such that this should have negated American Express's claim that obtainment of the cards was fraudulent. Strosnider admitted to learning of the possible sale of Prime-Line and the civil dispute over ownership prior to arresting Kenneth. However based on all of the information he received from American Express and the confirmation from Feeney that Kenneth was not authorized to apply for credit on Prime-Line's behalf, Strosnider was reasonable in crediting this information over knowledge of the existence of a civil dispute. Mere allegations in a civil lawsuit do not necessarily rise to the level of credible information.

Kenneth further argues that because the charges against him for improper use of personal identifying information and credit card theft misrepresentation were dropped, this demonstrates

lack of probable cause.  However, a reasonable officer's belief at the moment of arrest and a prosecutor's subsequent evaluation of the charges are not to be judged by the same standards. "The ultimate finding of guilt or innocence, or dismissal of charges arising out of an arrest and detention has no bearing on whether the arrest was valid." Valenti v. Sheeler, 765 F.Supp. 227, 230 (E.D. Pa. 1991) (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)).

Since the Court finds that Kenneth's arrest was supported by probable cause and therefore valid under the Fourth Amendment, it now turns to whether the subsequent warrantless search and seizure of the vehicle and its contents was valid.

**B.      Incident to Arrest Exception and Gant**

In Kenneth's initial Motion to Suppress, he argued that the search of his vehicle was not lawful under the incident to arrest exception to the warrant requirement.  The incident to a lawful arrest exception is based on both an interest in an officer's safety and evidence preservation; it allows a search of an arrestee's person and the area "within his immediate control."  Gant, 129 S.Ct. at 1716.  In the automobile context, the Supreme Court very recently retreated from a prior, more expansive understanding of incident to arrest searches and held that, where other exceptions do not apply, the passenger compartment of a car may be searched "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."[7] Id. at 1719.  The Government does not argue that the January 12, 2005 search falls into the incident to arrest exception, so it claims that Gant does not apply.  However the Court

---

[7]Although Gant was decided after Defendants were indicted, its ruling applies to this Motion.  See Schriro v. Summerlin, 542 U.S. 348, 351 (2004) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1987)) ("When a decision of this Court results in a 'new rule,' that rule applies to all criminal cases still pending on direct review.")

finds that the incident to arrest exception as described in Scalia's concurrence in <u>Thornton v.</u>

<u>United States</u>, 541 U.S. 615 (2004) does apply, as explained further below.

Although <u>Gant</u> presented a situation different from the instant automobile search and

seizure, the Supreme Court explicitly addressed and left open other relevant exceptions in the

automobile search context.  First, <u>Gant</u> stated that the unique circumstances of the vehicle

context "justify a search incident to a lawful arrest when it is 'reasonable to believe evidence

relevant to the crime of arrest might be found in the vehicle.'"  <u>Id.</u> at 1719 (citing <u>Thornton</u>, 541

U.S. at 632 (Scalia, J., concurring)).  Second, in what as known as the automobile exception,

where the police have probable cause to believe a vehicle contains evidence of criminal activity,

this authorizes a search of "any area of the vehicle in which the evidence might be found"; this

type of search includes "evidence relevant to offenses other than the offense of arrest, and the

scope of the search authorized is broader."  <u>Gant</u>, 129 S.Ct. at 1721 (citing <u>United States v. Ross</u>,

456 U.S. 798, 820-821 (1982)).  Third, <u>Gant</u> allows searches where the officer has a suspicion

that an individual is dangerous or might try to access weapons from the vehicle.  <u>Gant</u>, 129 S.Ct.

at 1721 (citing <u>Michigan v. Long</u>, 463 U.S. 1032 (1983)).  Finally the <u>Gant</u> majority noted that

evidentiary or safety concerns might justify searches in additional circumstances.  <u>Gant</u>, 129

S.Ct. at 1721.  It is the two exceptions articulated in <u>Thornton</u> and <u>Ross</u> that the Court believes

are applicable here.

### C.  Applicability of the Automobile (<u>Ross</u>) and Incident to Arrest (<u>Thornton</u>) Exceptions

The Government argues that the search was valid under the automobile exception to the

warrant requirement as described by the Supreme Court in <u>Ross</u>, which the Court explicitly left

open in Gant.  Under the automobile exception, based on the ready mobility of automobiles, law enforcement officers may seize and search an automobile without a warrant if "'probable cause exists to believe it contains contraband.'"  United States v. Burton, 288 F.3d 91, 100-101 (3d Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  Ross, 456 U.S. at 825.

Further, the search of the vehicle does not have to be contemporaneous to its lawful seizure.  United States v. Johns, 469 U.S. 478 (1985).  "[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized."  Id. (quoting Michigan v. Thomas, 458 U.S. 259, 261 (1982) ( per curiam)); see also United States v. Harwood, 998 F.2d 91, 97 (2d Cir. 1993) (finding that a search of the defendant's van at the police command three hours after it was seized was "eminently reasonable" based on hostile circumstances at the arrest scene).  It follows that the fact that the Redondo Police completed their evidentiary search at the police department after it was towed from the airport lot does not invalidate that portion of the search.

The issue then becomes an inquiry and evaluation of the scope of the Redondo Beach Police's probable case to search.  As discussed above, Strosnider had ample probable cause that Mitan was engaged in credit card fraud as to the Prime-Line American Express cards for which he had applied.  In addition, the police had probable cause that specific evidence of this crime, for which he was arrested, was inside the vehicle:

(1)    The police observed Kenneth enter the vehicle with the American Express package obtained from the UPS store.

-24-

(2)     The police observed Kenneth exit the vehicle and later re-enter with a Virtually Wireless bag; they then learned that Kenneth had made a Virtually Wireless purchase with one of the American Express credit cards.

(3)     The police observed Kenneth drive the vehicle to the airport parking lot and learned that he had purchased a plane ticket with one of the American Express credit cards.

Strosnider testified multiple times that at least one of the purposes of the police's search was a search for evidence, and CHP Form 180 confirms this.[8]  Therefore, under both the Thornton incident to arrest exception and the Ross automobile exception, the Redondo Beach Police were justified in their search for evidence of the Prime-Line fraud both because the vehicle contained evidence of the offense of arrest and because the police had probable cause that the vehicle contained evidence of a crime.  This evidence consisted of the credit cards obtained from Mitan's person, the UPS and other packaging that contained the credit cards when they were mailed, and the Virtually Wireless bag and its contents (including the cell phone and phone application).

However, these are the only items for which Strosnider had developed sufficient probable

---

[8]The Court acknowledges Defendants' argument that the CHP Form 180 that the Government introduced as Exhibit G-4 at the evidentiary hearing was an altered version of the original form based on the discrepancies between it and the subpoenaed versions of the form obtained from Frank Scotto's Tow Yard.  (See Def. Kenneth Mitan's Br. Exs. D, E, G.)  As Strosnider testified, he originally listed the "Storage Authority / Reason" as California Vehicle Code § 22651(h), which permits towing of a vehicle where the person in control of the vehicle has been arrested, but then changed the reason to Code § 22655, which permits impounding a vehicle that contains evidence which cannot readily be removed.  The Court found Strosnider's testimony credible that he believed the car contained evidence of a crime, and the Court will not penalize him for initially writing one reason and then changing it during the course of the day.  The Court discusses an additional discrepancy in Form 180 infra n.9.

cause to search.  The Court finds that police could not have had a reasonable belief that any other

Prime-Line related evidence was in the vehicle.  The mere fact that Strosnider viewed a large

volume of business-related documents in the car does not lead to the logical conclusion that these

documents were related to the Prime-Line fraud.  Therefore only the cards, UPS packaging, and

Virtually Wireless items are admissible evidence related to Prime-Line Inc.

Along the same line of reasoning, Strosnider did not have probable cause to search for

documents related to businesses other than Prime-Line or evidence of any other crime.  Although

Ross allows a search of "every part of the vehicle . . . that may conceal the object of the search,"

456 U.S. at 825, the precedents do not permit a search to go beyond that particular object.  The

Government argues that the police could search for any and all objects in the vehicle because

there was probable cause of broader fraudulent activity based on the following pieces of

information—American Express's statement to Strosnider that the Mitans had other unpaid

corporate American Express accounts totaling $325,000 and the allegations of additional

business fraud on the mitanalert website.  However, this knowledge by itself is not sufficient for

a reasonable officer to believe either that the Mitans were engaged in additional fraudulent

schemes or that the vehicle contained such evidence.  Although Strosnider visually observed

many business and financial documents and a laptop from outside the car, the mere presence of

these objects does not rise to the level of probable cause that they were in any way connected to

fraud.  There are any number of plausible and legitimate explanations for the documents and

laptop, and Strosnider's mere suspicion of additional fraudulent activity is not legally sufficient

to establish probable cause for a further search.  In addition, the police had no reason to believe

that the trunk contained evidence of criminal activity, since they never observed Mitan going into

-26-

the trunk.  To stretch the automobile exception further than the specific evidence of the Prime-Line fraud described above would undermine the purpose of the Fourth Amendment and the Supreme Court's narrowing view of automobiles searches, as expressed in <u>Gant</u>.

The Government also argued that the vehicle itself was evidence of the crime, and therefore its search was lawful.  It argues that because Kenneth was driving a car registered to Frank and because Kenneth had signed Frank's name at the UPS Store, a reasonable officer would believe that Kenneth was using his father's identity, as well as his car, in furtherance of the crime.  The Court does not follow this argument.  Although the vehicle was used to facilitate the allegedly fraudulent activities that day, the car itself was not evidence of the particular crime of credit card fraud.

Based on this analysis, the Court will allow the Prime-Line-related evidence that the police personally observed being obtained and placed in the car by Kenneth under the incident to arrest and automobile exceptions but will disallow additional evidence collected from the car.

### D.    Inevitable Discovery Exception

The Government also argues that the evidence recovered from Kenneth's vehicle is permissible under the inevitable discovery warrant exception, since it would have been recovered when the police conducted a lawful inventory search.  Under the inevitable discovery exception, evidence that would have been discovered by lawful means is admissible, even if its actual means of discovery was unlawful.  <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984).  An inventory search of a properly seized vehicle is a valid exception to the warrant requirement provided that the search is "'conducted according to standardized criteria or established routine.'"  <u>United States v. Salmon</u>, 944 F.2d 1106, 1120 (3d Cir. 1991) (quoting <u>Colorado v. Bertine</u>, 479 U.S.

367, 374 n.6 (1987)).  This requirement ensures that "police officer[s] ... not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" Salmon, 944 F.2d at 1120 (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)). In the Third Circuit, the criteria do not need to be written down.  United States v. Felder, 2008 WL 2051967, at *3 (E.D. Pa. 2008) (citing United States v. Frank, 864 F.2d 992 (3d Cir. 1989)). The Government has the burden to show that the contested evidence would have been acquired through a lawful search.  United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998). However, "the analysis should focus upon the historical facts capable of ready verification, and not speculation."  Id. (citing Nix, 467 U.S. at 444, n. 5).

     In the instant case, the Government's inevitable discovery argument based on an inventory search is somewhat opaque because the Redondo Police did in fact conduct at least a partial inventory search.  Strosnider testified that he did an initial inventory search at the airport parking lot prior to the car being towed to ensure that it could be safely towed.  Strosnider also testified that the police conducted a final inventory search after all of the evidence had been removed from the car and prior to its impoundment at the Frank Scotto Tow Yard.[9]  Therefore,

---

     [9]The Police's stated reason for towing the car to the Tow Yard is in some dispute.  CHP Form 180 contains four options with a check box next to each: Stored, Impounded, Released, and Recovered.  The version of the form subpoenaed by Defendants from Frank Scotto Tow Yard had a mark in the "Stored" box.  (Def. Kenneth Mitan's Br. Ex. D.)  Another subpoenaed version of the form, which the Tow Yard appeared to have received by fax later that day, showed both the "Stored" and "Impounded" boxes marked.  (Id. Ex. E.)  However, the version produced by the Government at the evidentiary hearing had only the "Impounded" box marked, and the entire check box next to "Stored" no longer appeared. (Id. Ex. G.)
     Although Defendants allege that this calls into question the reliability of the Government's evidence generally, the Court does not think the conflicting forms are material to its analysis and determination of this case.  The Government offered a proffer about why the forms may have been different, but the Court does not feel it necessary to credit or discredit this explanation.

-28-

the Government's inevitable discovery argument, which requires the Court to determine whether a valid inventory search would have occurred had the illegal search not taken place, is difficult to apply when an inventory search took place along with the illegal search.  Regardless, the Court will evaluate both the limited inventory search that occurred and the search that would have occurred had the invalid evidence search not occurred.

The Government has not carried its burden to prove a lawful inventory search for two reasons.  First, the Court will assume that had the illegal evidence search not occurred, the police would have removed the specific Prime-Line evidence at the airport lot.  The Court also will assume that the car would not have been impounded pursuant to California Vehicle Code § 22655.5, since it no longer contained evidence which could not be easily removed, but that the car would have been towed and stored pursuant to California Vehicle Code § 22651(h) as was originally marked on the Form 180.[10]  However Strosnider never testified that stored vehicles are inventoried, only that impounded vehicles are inventoried.  (See Hr'g Tr. 50:5-12, May 6.)  Therefore, this Court can not assume that had the illegal evidence search not taken place, the car would have been inventoried pursuant to it being stored.  Cf. United States v. Wogan, 356 F.Supp.2d 462, 470 (M.D. Pa. 2005) (finding that the inevitable discovery rule did not apply where the officer testified that the police department did not have a standard policy of searching vehicles following impoundment).

---

[10]Kenneth argues that the vehicle could not have been towed properly under Vehicle Code § 22651(h) because he was not "in control" of the vehicle at the time he was arrested but was instead walking away from the vehicle.  The Court does not have reliable testimony about where Kenneth was located vis a vis the vehicle when he was arrested.  However, for the purpose of evaluating the inevitable discovery argument, it will assume arguendo that § 22651(h) applies and the car would have been towed.  Since the Court finds in Defendants' favor on the inevitable discovery argument, this assumption is not prejudicial.

Second, even if it was Redondo Beach Police policy to inventory all cars towed for storage, the Court can not assume that the police would have followed inventory procedures as required by Salmon. 944 F.2d at 1120. Strosnider's testimony as to inventory procedures was somewhat unclear. However he testified that doing an inventory search involved conducting a thorough, systematic search of the car and completing a CHP Form 180. In addition, the Redondo Beach Police Manual, Chapter 5 contains procedures for the booking of property and evidence. (See Def. Kenneth Mitan's Br. Ex. H.) Section 5.01 states that the employee "who recovers evidence or finds property, shall be responsible for transporting and booking," which requires placing the property or evidence in a property locker or other appropriate storage location at the direction of the watch commander. (Id.) Section 5.03 requires property to be stored in specific types of containers and tagged with particular information. (Id.) Chapter 2 contains procedures for the Property Control Unit, including that all property be properly "logged, classified, stored, dispensed, and stored as soon as possible." (Id. at § 2.03.)

Yet none of these procedures were followed in the evidence search or limited inventory search performed by the Redondo Beach Police. None of the evidence removed from the car at the parking lot or at the police department was logged, classified, or organized, nor was it placed in a proper storage locker. Instead CHP Form 180 lists only three items recovered from the car—miscellaneous junk, miscellaneous clothing, and two DVDs—none of which is evidence relevant to possible fraudulent activity by Mitan. Therefore, based on the Nix standard to follow "historical facts" known to this Court and not speculation, the Court finds that the police did not follow proper procedures in the limited inventory search they conducted and would not have followed these procedures had they done a full inventory search instead of the illegal evidence

search.  See United States v. Atkins, 2000 WL 781439, at *4 (E.D. Pa. 2000) (refusing to credit

an inevitable discovery argument because it required undue speculation as to what the police

would have done).  For these reasons, the Government's inevitable discovery argument fails.

>     **E.     Plain View Exception**

Finally the Government argues that the evidence is permissible under the plain view

exception.  Under the plain view doctrine, "if police are lawfully in a position from which they

view an object, if its incriminating character is immediately apparent, and if the officers have a

lawful right of access to the object, they may seize it without a warrant."  Minnesota v.

Dickerson, 508 U.S. 366, 375 (1993).  In order for the object's incriminating character to be

immediately apparent, the police must have probable cause to believe the object is contraband

without conducting a further search.  Id.  Documents may be immediately apparent as

incriminating if an officer's brief glance can confirm that they are evidence of criminal activity.

See United States v. Menon, 24 F.3d 550, 563 (3d Cir. 1994).  Further, police officers have a

lawful right of access to "that portion of the interior of an automobile which may be viewed from

outside the vehicle by either inquisitive passersby or diligent police officers."  Texas v. Brown,

460 U.S. 730, 740 (1983).

The Court can not credit the Government's plain view argument.  Although Strosnider

testified to seeing various business-related documents and the corner of the laptop computer from

both outside the car and inside the passenger compartment when he lawfully seized the Prime-

Line-related items, their incriminating nature was not "immediately apparent."  Strosnider did not

have a reasonable belief that fraudulent activity beyond that related to the Prime-Line credit cards

had occurred.  As such, the various papers with business information, escrow papers, and bank

documents that he saw inside the car's passenger compartment could not be immediately apparent as connected to the criminal activity for which Strosnider had probable cause.  Further Strosnider testified that he did not recognize the business names on the documents.  In addition, Strosnider testified that he moved some of the documents around to further identify them; moving documents around also supports the conclusion that their incriminating nature was not immediately apparent.  As such, the Government's plain view argument fails.

## VI.  <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion to Suppress  is denied as to the following Prime-Line evidence: the American Express credit cards, the credit card mail packaging, and the Virtually Wireless bag and items contained therein.  Defendants' Motion is granted as to all other documents and the laptop computer obtained from the vehicle on June 12, 2005.

An appropriate Order follows.

O:\Criminal Cases\08-760 Mitan, us v\Memo re Mot to Suppress.wpd