**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KENNETH MITAN | : | NO. 08-760-1 |
| FRANK MITAN | | NO. 08-760-2 |

**Baylson, J.**                                                               **September 23, 2009**

**<u>MEMORANDUM</u>**

_____Presently before this Court is the Government's Motion In Limine to Admit Evidence

Pursuant to Federal Rule of Evidence 404(b) (Doc. No. 138) and Responses thereto from

Defendants Kenneth Mitan, proceeding <u>pro se</u>, and Frank Mitan, represented by court-appointed

counsel.  The Motion concerns evidence of three additional allegedly fraudulent purchases of

small businesses not charged in the Superseding Indictment and evidence from two prior arrests

of Kenneth Mitan.  A hearing on the Motion was held on August 26, 2009.  For the following

reasons, the Motion will be granted in part and denied in part.

**I.     Factual Background and Proposed Evidence**

      **A.     Background of Pending Criminal Charges**

Defendants Kenneth Mitan ("Kenneth"), Frank Mitan ("Frank"), Bruce Atherton, and

Charro Pankratz were indicted on December 18, 2008 (Doc. No. 1).  Defendants Kenneth and

Frank were indicted on five counts: conspiracy to commit wire and mail fraud (Count I), two

counts of mail fraud (Counts II - III), and two counts of wire fraud (Counts IV - V).  Kenneth was

also indicted on a sixth count: use of a false name in a fraud scheme (Count VI).  Defendants

Atherton and Pankratz (who have since entered guilty pleas) were indicted solely on the

conspiracy count (Count I).  The Government added a perjury charge against Kenneth (Count

VII) in the Superseding Indictment filed April 23, 2009 (Doc. No. 133).

Defendants are accused of defrauding four small businesses using a similar fraudulent scheme as to each business.  (Superseding Indictment ¶¶ 1, 13-16.)  The scheme involved approaching the business under false pretenses, negotiating to buy the business, not paying the full amount of money due under the contract at closing, taking control of the business, and diverting its cash and accounts receivable for purposes other than the maintenance of the business.  (Id. ¶¶ 8-12.)  The four allegedly defrauded businesses named in the Superseding Indictment are: (1) Benny's Cheese Company, a food services company in Philadelphia, Pennsylvania, acquired around September 9, 2005; (2) Engel Corporation, a printing and copying business in Reston, Virginia, acquired around September 13, 2005; (3) Housewares Distributors, Inc., a home furnishing business in West Bend, Wisconsin, acquired around September 15, 2006; and (4) Pruscino Brothers Produce, a food services business in East Brunswick, New Jersey, acquired around October 19, 2007.  (Id. at ¶¶ 13-16.)  The Superseding Indictment also contains allegations that Kenneth Mitan used a corporate entity, Williams Fund, to facilitate takeover of three of the four named target businesses and used a false name, such as "John Adams" or "John Thompson," in negotiating the purchase of all four businesses.  (Id. at ¶ 8, ¶¶ 13-15.)

**B.    Contested 404(b) Evidence**

The Government seeks to introduce evidence concerning three additional business transactions involving each of the four Defendants.  In addition, it seeks to introduce evidence gained during two prior arrests of Defendant Kenneth Mitan.  This evidence is described below. Unless specifically disputed by Kenneth, all facts are taken from the Government's Motion in Limine.

1.    **Tuckahoe Enterprises**

_____Tuckahoe Enterprises is a family-owned egg processing business based in Richland, New Jersey.  The Government alleges that Kenneth approached the company's owners in late summer 2007 to discuss buying the company and identified himself as "John Hill."  The Government further alleges that Kenneth claimed to be a representative of the Metzger Investment Group, a group of three investors with $10 million to invest in East Coast food companies.  The Government asserts that Kenneth provided the sellers with a stock purchase agreement to buy Tuckahoe for $1,325,000, with the broker's fee, an outstanding bank loan, and payment for outstanding inventory to be paid at closing.  Kenneth asserts that in fact the stock purchase agreement was between Superior Foods, a company in formation, and the previous owners of Tuckahoe, not between Kenneth or Metzger Investment Group and the previous owners.  (Def. Kenneth Mitan's Resp. 7, Ex. A.)

At the closing on November 19, 2007, the Government argues that Kenneth did not make any of the promised payments; instead Kenneth claimed that because it was late in the day, they could not create a promissory note, open an escrow account for the shares, or wire payment for the inventory, as called for in the agreement.  Kenneth asserts that the broker's fee was not to be paid until January 2008, pursuant to the Finder's Fee Agreement, and that the inventory payment was also to be paid later, pursuant to the Closing Statement; in addition, the cash down payment was only to be paid in "good funds," automated clearinghouse, or wire transfer.  Kenneth further argues that under the Payment Directive Letter, once $601,000 was paid to sellers or their assignees, the transaction was closed.  He claims that a total of $607,017.33 was paid through four different checks between November 21, 2007 and December 20, 2007.  (Id. Ex. B.)   In

addition, Kenneth claims that the sellers received a total of $1,081,000 (id. Ex. C), plus a promissory note for $530,000 collateralized by the plant's own equipment.

The Government further claims that Defendant Pankratz accompanied Kenneth to the closing and that Kenneth told the sellers that Pankratz was his financial analyst and would be running the company following closing. By contrast, Kenneth asserts that Superior Foods empowered Pankratz as the company's new Chief Executive Officer. (Id. Ex. D.)

Following the closing, the Government claims that Kenneth and Pankratz seized incoming receivables and cash. Tuckahoe began to acquire significant debt as Pankratz failed to pay suppliers and staff or paid with checks returned for insufficient funds. The seller advised Kenneth that the company was headed towards bankruptcy. In December 2007, the seller learned of Kenneth's true identity and confronted him. The Government asserts that the seller then contacted authorities to investigate. Kenneth argues, however, that the Tuckahoe sellers deceived the New Jersey police by stating that they had not been paid, when in fact they had, and then the sellers resorted to self-help in trying to retake control of Tuckahoe.

Kenneth, Pankratz, and Atherton are currently facing state criminal charges in New Jersey related to Tuckahoe. State of New Jersey v. Mitan, et al., 08-06-00110-S (N.J. Super. Ct.). In addition, the sellers instituted a civil action in New Jersey against Superior Foods, Pankratz, and Tuckahoe on December 10, 2007. (Def. Kenneth Mitan's Resp. Ex. D.) Kenneth asserts that the sellers' claims focus on mismanagement and criticism of Defendant Pankratz's conduct as CEO, not on fraud or fraudulent pretenses. Kenneth further denies any role in the operational problems of Tuckahoe.

2.    **Spectacular Sports**

Spectacular Sports is a family-owned sports travel company based in New Orleans.  The company organizes all-inclusive trips to major sporting events such as the Super Bowl.  Kenneth approached the company in the summer of 2005 to inquire about buying the company, identifying himself as John Adams of the Williams Fund.  The Government contends that Kenneth claimed the Williams Fund was backed by Asian investors with over $10 million to invest.  Kenneth argues that Spectacular Sports admits to doing background research about the Williams Fund and finding no information about the company, but, despite this, the sellers proceeded with the deal.  The Government further asserts that under the stock purchase agreement, $260,000 was due at closing to cover broker and sellers' attorney costs; in addition, Williams Fund was to assume nearly $750,000 of the company's debt.

On December 19, 2005, the closing day, the Government claims that Kenneth did not have any of the promised payments but assured the sellers that the money would be forthcoming.  However Kenneth asserts that the stock purchase agreement allowed until January 11, 2006 to close by the terms, although he points to no provision in the contract stating this.  (Id. at 13.)  Kenneth documents a wire transfer of $260,000 made January 3, 2006.  (Id. Ex. M.)  Kenneth further argues that the agreement states that purchase was subject to the company's debt, not that Williams Fund assumed the debt.

Based on his promises to pay, Kenneth took control of the business checking account.  On December 20, 2005, Frank Mitan opened a Spectacular Sports account at Bank One in Michigan and deposited receivables and money from Spectacular Sports's previous operating account into this new account.

Kenneth hired C.M. to oversee operations at Spectacular Sports, and on January 9, 2006, C.M. took over management of Spectacular.  C.M. realized shortly thereafter that Kenneth had total control of the company's money and was not paying debt, utilities, rent, and other bills.  The Government contends that C.M. requested money from Kenneth for the company to purchase Super Bowl tickets to fulfill its existing commitments to customers who had already put down deposits for Super Bowl trips.  However Kenneth argues that, prior to the sale of the company, the sellers had received money for the Super Bowl tickets but had diverted the money elsewhere. Kenneth further asserts that the Williams Fund sent a Letter of Default to the sellers regarding this matter and that the parties entered a settlement agreement to determine responsibility for the Super Bowl ticket deposits.  (Id. Ex. O.)  Kenneth argues that Spectacular Sports attempted to fulfill its ticket obligations but could not do so because of a large price increase.

On February 1, 2006, C.M. notified customers that Spectacular Sports could not fulfill its ticket commitments.  On February 3, C.M. discovered Kenneth Mitan's real identity and confronted him.  On February 6, C.M. received an email from "Frank Miller," believed to be Frank Mitan, rejecting his concerns about the Williams Fund's acquisition.  On February 7, C.M. received another email from "Frank Miller" containing a Williams Fund report on its strategy for Spectacular Sports and rejecting Williams Fund's responsibility for the Super Bowl ticket debacle.  On February 10, "Frank Miller" sent an email to C.M. and other Spectacular Sports employees laying them off.

C.M. was then informed that Defendant Bruce Atherton, the Williams Fund attorney, was handling the Spectacular Sports file.  C.M. contacted Atherton on February 16 about money owed to him; Atherton responded that C.M. was merely a creditor and that Williams Fund

intended to liquidate Spectacular Sports.  Spectacular Sports went out of business in February 2006.  In a civil lawsuit, a Louisiana state court on August 28, 2006 found that the Williams Fund had defaulted on its sales contract and its failure to perform was in bad faith.  Kenneth asserts that the sellers filed an additional frivolous lis pendens suit, which forced Williams Fund to liquidate all of Spectacular Sport's real property at a significant discount and incur substantial legal fees.

### 3.    Super-1 RV

Super-1 RV is a recreational vehicle dealership near Atlanta, Georgia.  Kenneth approached the owners in summer and fall 2005 about purchasing the company, using the name "John Adams" as a representative of Williams Fund.  The parties agreed to the sale price of $2,600,000, with $365,000 due at closing ($125,000 to the seller and $240,000 to the seller's business broker).  On September 23, 2005, at closing, the Government asserts that Kenneth did not pay the promised amounts but assured the sellers that the money would be wired the following day.  However Kenneth claims that $365,000 was paid the following day in three separate checks.  (Id. 18, Ex. T.)  As security for the balance of $2,235,000, Kenneth collateralized equipment and inventory at Benny's Cheese Company, Engel Corporation, McCreight Wholesale Florist, and Perma-Clad Inc.  However, the Government argues that Kenneth did not have documents to collateralize these assets or demonstrate ownership of the assets at closing.  The Government further alleges that the Mitan conspiracy had gained control of each of these businesses used as collateral under fraudulent pretenses in recent weeks.  By contrast, Kenneth contends that the $2,235,000 note was fully secured by about $3,500,000 in assets, for which UCC financing statements had been filed.  (Id. Ex. Y.)

On the day of closing, the Government asserts that Kenneth informed the former accounting manager, now Chief Financial Officer (CFO), to keep all financial information secret from everyone but Kenneth.  Kenneth alleges that under the Operating Agreement, Williams Fund was entitled to all income from the Company on and after the date of Agreement.  (Id. Ex. U.)  Kenneth then had the seller sign the company's checks and took control of most of them, explaining to the CFO that he was giving the checks to an accounting company, Marsh & McConnell, who would assume check-writing responsibilities for the company.  Upon later inquiry, Marsh & McConnell stated that they had never made such an agreement with Kenneth.

Following this, many Super-1 RV checks were returned for insufficient funds.  In addition, Kenneth was sending large checks to Super-1 RV's CFO from his other recently-acquired companies, including Benny's Cheese and Engel, with instructions to deposit them.  At the same time, Kenneth was writing checks from Super-1 to Benny's Cheese and Engel. Kenneth does not deny that funds between the three companies were intermingled.  However, Kenneth argues that he was completely entitled to control Super-1 RV's finances.

In October 2005, the CFO informed Kenneth that Super-1 RV was in jeopardy of being overdrawn.  Kenneth gave the CFO blank, signed checks from Benny's Cheese to be filled in later upon his instructions.  On November 4, 2005, the seller was notified that employee payroll checks were not clearing.  He and his wife withdrew $60,000 from their personal account to cover the payroll checks.  The seller then began investigating the company's financial records and discovered that under Kenneth's direction the company had stopped paying its sales tax obligations, insurance, rent, and utilities since the time of purchase.

The seller than reasserted control of the business, attempting to rebuild its reputation.

However in November 2006, the company declared bankruptcy.  The seller also had to declare personal bankruptcy in spring 2007 because of the amount of personal money he invested in attempting to save the business.

Kenneth claims that the seller filed a civil suit alleging fraudulent pretenses against Kenneth, Frank Mitan, Zack Williams, and two Asian investors of the Williams Fund, but that the court sent the case to arbitration, which the seller never pursued.  Kenneth also asserts that it was the sellers who defaulted under the terms of the stock purchase agreement because of undisclosed liabilities and liquidated assets prior to closing and a misrepresentation as to the amount of floor plan financing (id. Ex. BB), whereas Williams Fund was current on its promissory note obligations.

### 4. Redondo Beach Arrest

On January 12, 2005, Kenneth Mitan was arrested in Redondo Beach, California, pursuant to a police investigation into alleged credit card fraud.  Large amounts of documents and a computer were seized from Kenneth's car at the time of arrest.  However, on July 23, 2009, this Court ruled on Kenneth and Frank Mitan's Motion to Suppress this evidence because no warrant had been obtained for the search and no exceptions to the warrant requirement applied (Doc. Nos. 240, 241).  The Motion was granted in part and denied in part.  2009 WL 2195321.  The Government now advises that it no longer wishes to use any of this evidence.  (See Govt's Reply Mot. In Limine 2.)

### 5. Gretna, Louisiana Arrest

On May 26, 2004, Kenneth Mitan was arrested in Gretna, Louisiana, by the local police pursuant to a Governor's warrant from Michigan because he was a fugitive from the state at that

time.  Gretna police initially received a call from a business owner who stated that a man was attempting to use a false name, "John Smith."  When the police approached Kenneth, he stated to them that his name was "John Smith."  Kenneth then admitted his real name after being asked to show identification.

The Government does not seek to introduce evidence surrounding the circumstances of the Governor's warrant or the arrest.  Instead, the Government requests to introduce the fact that Kenneth used an alias during his arrest to demonstrate Kenneth's tactic of using a false name.

## II.   <u>Procedural History</u>

There have been numerous pre-trial motions filed in this case.  Trial is set to begin October 5, 2009.  The Government filed the instant Motion in Limine to Admit Evidence under Fed. R. Evid. 404(b) on April 28, 2009 (Doc. No. 138).  Defendant Kenneth Mitan responded on July 7, 2009 (Doc. No. 229) and filed additional exhibits related to his response on July 13, 2009 (Doc. No. 233).  Defendant Frank Mitan filed a response on July 15, 2009 (Doc. No. 237).  The Government replied on July 31, 2009 (Doc. No. 252).  Kenneth filed a sur-reply on August 6, 2009 (Doc. No. 255).  Frank filed a sur-reply on August 19, 2009 (Doc. No. 262).  Defendant Bruce Atherton also filed a response in opposition to the Motion (Doc. No. 266), but withdrew his opposition when he changed his plea.

On August 12, 2009, the Court ordered that oral argument be held on the Motion in Limine (Doc. No. 258).  The Government was ordered to delineate at the hearing how it would present the evidence described in its Motion, including evidence related to Williams Fund.  This Court held oral argument on August 26, 2009.  It made several rulings on the Record at that hearing and asked for additional submissions from the Government, which filed an Offer of

Proof as to how it intends to introduce evidence of the proposed transactions (Doc. No. 300),

from which both Defendants have responded (Doc. Nos. 306, 307, 335).

### III.    Parties' Contentions

#### A.    Government's Contentions

The Government argues that each of the three transactions outlined above are highly

similar in planning and execution to the four allegedly fraudulent transactions named in the

Superseding Indictment.  Specifically, the Government alleges that the transactions are all part of

a common scheme involving the Defendants approaching the victim seller using a false name and

as an agent of an investment company, negotiating a stock purchase agreement, failing to fulfill

terms of the stock purchase agreement at closing, diverting the assets and receivables of the

victim company to shell accounts, failing to timely pay bills and debts of the victim company,

executing bad checks to creditors or from one victim company to another to perpetuate the fraud,

and threatening victims with legal action.  Under the Third Circuit's liberal standard of admitting

Rule 404(b) evidence, the Government argues that the three proffered transactions are highly

relevant to show Defendant's intent, knowledge, plan, modus operandi, and absence of mistake

with regard to the four transactions charged in the Superseding Indictment.  Regarding the

Louisiana arrest, the Government argues it is relevant to intent, knowledge, and modus operandi

to show Kenneth's frequent use of false names.  Additionally, the Government asserts that the

highly probative nature of the proposed evidence weighs against any unfair prejudice.

The Government goes further in arguing that the three proffered transactions are intrinsic

evidence to the crime charged because they form an integral part of the common scheme or plan

to defraud, as particularly demonstrated by the passing of bad checks between the various

companies, and share consistent characteristics.

**B.** **Kenneth Mitan's Contentions**

Kenneth argues that there is no "causal link" between the charged transactions and the three transactions named in the 404(b) motion.  First, Kenneth argues that the Government's characterization of the facts regarding each of the three named transactions is wrong and offers numerous exhibits to attack the Government's version of the facts, as detailed in the factual background discussion supra Part I.B.

Second, Kenneth claims that the transactions offered as 404(b) evidence are not similar to the transactions described in the Superseding Indictment and therefore can not be used to show a common scheme or plan.  He claims that Tuckahoe Enterprises was dissimilar because no representations were made to the seller about the purchaser, the seller knew the purchaser was a company in formation, and no legal action for fraud was taken against the purchaser.  He asserts that Spectacular Sports is dissimilar because it was an all cash deal, paid by wire transfer, and because the seller was aware that it knew nothing about the purchaser, therefore there could be no fraudulent pretenses.  As to Super-1 RV, Kenneth asserts that it was dissimilar because the seller was paid and because the Williams Fund was legally entitled to all income and profits under the Operating Agreement.  Finally, Kenneth asserts that the evidence that the Government seeks to admit goes more to mismanagement of the three target businesses rather than demonstrating a fraudulent purchase.

Third, Kenneth argues that there is no proper purpose for the proffered 404(b) evidence. He claims the transactions were not "bad conduct" under the preponderance of the evidence standard because they were not fraudulent but instead were legitimate business purchases.

Therefore he asserts that these transactions can not be probative of intent, knowledge, or absence of mistake.  Further, Kenneth argues that the evidence can not be used to show modus operandi because identity is not disputed here.

Fourth, Kenneth argues that the proposed evidence is highly prejudicial.  Especially with regards to the Tuckahoe transaction in New Jersey, Defendants Kenneth, Pantratz, and Atherton are facing pending charges in New Jersey state court, and consideration of this transaction in federal court could prejudice their right to a fair trial in New Jersey.  Since the allegations related to Tuckahoe occurred subsequent to the charged activities in the Superseding Indictment, Kenneth further argues that their probative value is highly diminished.  In addition, Kenneth argues that evidence of his arrests for an unrelated action is not probative and highly prejudicial.

Fifth, Kenneth argues that the three transactions offered as 404(b) evidence are highly complex and that presenting evidence and witnesses related to these transactions at trial will dwarf the presentation of evidence related to the charged transactions.  Kenneth claims that he offered the Government the chance to enter into stipulations related to this evidence, but the Government has refused to agree.

### C.    Frank Mitan's Contentions

Frank Mitan argues that the sole purpose for the Government admitting the 404(b) evidence is to impugn Defendants' characters, which is an improper purpose, and that the evidence fails the test for admissibility.  As an initial matter, Frank argues that the proposed evidence is not intrinsic because evidence of intermingled checks does not directly prove the charged crimes or any element thereof.

In addition, Frank asserts that the proposed evidence is not admissible as "other acts"

evidence under Rule 404(b) because it fails the four-part <u>Huddleston</u> test.  First, there is no proper purpose for the bad acts evidence because the Government has not connected the proposed evidence to the charged offenses but instead has merely alleged consistent characteristics and relies on a mere assertion of knowledge, intent, plan, etc.  Second, Frank argues that the evidence is not relevant because he disputes the Government's characterization of the evidence, as articulated by Kenneth's version of the facts, and because the Government has not explained the proof of these bad acts it will offer at trial.  Frank further asserts that the Government has no proof of his involvement in the schemes, but merely alleges that "Frank Miller" is Frank Mitan.  Further, evidence of Kenneth's arrests on totally unrelated offenses is not relevant.  Third, Frank claims any probative value is outweighed by the prejudice of implying a history of similar conduct through unsubstantiated allegations.  Fourth, a limiting instruction would not cure the unfair prejudice.

In the alternative, if the 404(b) evidence is admitted, Frank requests that his trial be severed from the other Defendants under Fed. R. Crim. P. 14.  Frank asserts that since many of the bad act allegations do not involve him and are unrelated to the charges against him, he would be prejudiced by a joint trial.

### D.     **Government's Reply**

The Government first acknowledges that it no longer seeks to admit the evidence seized during Kenneth's Redondo Beach arrest because the Court ordered some of the evidence be suppressed.  The Government then reasserts its argument that evidence of the three business transactions is intrinsic to the charged conspiracy because the Defendants used these transactions and their proceeds to further the conspiracy described in the Superseding Indictment.  The

Government offers specific evidence to show that the proposed evidence is inextricably bound to the charged offenses: use of a Spectacular Sports debit card to pay Williams Fund expenses; diversion of Spectacular Sports funds to Teresa Mitan's (Kenneth's mother and Frank's ex-wife) shell company; large checks passed to and from Super-1 RV, Engel Corporation, Benny's Cheese, and Williams Fund; and money transferred from Tuckahoe's shell account to Pruscino Brothers' operating account in order to cover payment obligations.  The Government further argues that the proposed evidence is part of a single ongoing scheme to defraud.

_____Alternately, the Government argues that the proposed evidence is admissible under Rule 404(b) and the four-part Huddleston test.  First, the Government argues that its legitimate evidentiary purpose is to show a common plan with consistent modus operandi in defrauding businesses, the absence of mistake as to the criminality of the scheme, and Defendants' knowledge and intent of the scheme.  Further, the nearly identical nature of aspects of the three proposed transactions and the four charged transactions supports the legitimate evidentiary purpose and shows a long-running scheme.  The Government intends to introduce this evidence through testimony of those involved in the transactions, bank records, correspondence, and other documents.  Third, the Government argues that Defendants have not shown that the evidence is unfairly prejudicial, since the transactions charged and proposed as 404(b) evidence are nearly identical and since Defendants argue that all transactions were legitimate business deals.  Fourth, the Government argues that a limiting instruction will be sufficient to protect against any remaining unfair prejudice.

Finally, the Government argues that Frank's proposed severance is not warranted since Defendants were indicted together, are charged in a single conspiracy, and the jury will be able to

separate and apply the evidence individually.  Further, most of Frank's objections relate to the

Redondo Beach evidence, which is now suppressed, in part.

### E.      Kenneth Mitan's Sur-Reply

Kenneth refutes the arguments made in the Government's Reply brief and reiterates his

characterization of the facts concerning the proposed evidence.  First, Kenneth rejects the

Government's argument that the proposed evidence of the three transactions is intrinsic because

the Government's specific evidence to support this argument is mischaracterized and

unsupportive.  Kenneth asserts that the mere fact of monetary transfers between companies does

not make such transfers illegitimate.  Second, Kenneth claims that the proposed evidence is

unrelated to the charged offenses because the three proposed transactions were legitimate and

unique, the Williams Fund was only involved in one transaction, and the fraud claims are really

claims of mismanagement.  Kenneth further claims special prejudice related to the Tuckahoe

transaction.  Finally, Kenneth asserts that evidence of his Louisiana arrest is completely unrelated

to the alleged fraud scheme.

### F.      Frank Mitan's Sur-Reply

Frank filed a sur-reply to expand on his argument that the evidence is not proper under

Rule 404(b).  Frank argues that each of the evidentiary purposes asserted by the Government is

invalid.  First, modus operandi evidence is only proper to show a defendant's identity, which is

not at issue here.  Second, absence of mistake evidence is only proper in cases where mistake or

accident is a plausible defense, but here Defendants admit their actions and assert that all actions

were legal.  Third, evidence to show knowledge is only relevant if the evidence shows that

defendants were previously put on notice that future similar conduct would be wrong.  Frank

further asserts that the Government's evidence is prejudicial based on its complex nature, which will require time-consuming, confusing presentation to the jury, and because he was only involved in one of the three transactions.  Frank reasserts his desire to have his trial severed.

**IV.    Legal Standard**

 **A.    Federal Rule of Evidence 404(b)**

 Under Federal Rule of Evidence 404, evidence of a person's character or of other crimes, wrongs, or acts is not admissible for the purpose of proving conformity therewith.  Fed. R. Evid. 404(a), (b).  However, evidence of other crimes, wrongs, or acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice . . . of the general nature of any such evidence it intends to introduce at trial."  Fed. R. Evid. 404(b).  Rule 404(b) is a rule of inclusion, not exclusion.  United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003).  Therefore, the Third Circuit "favors the admission of evidence of other criminal conduct if such evidence is 'relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime.'"  Id.  (citing United States v. Long, 574 F.2d 761, 765 (3d Cir. 1978)).  However, a court must be careful in accepting the Government's alleged purpose for admission, which "may often be potemkin village, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."  United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992).  The proper admission of such evidence is in the district court's discretion.  United States v. Mastrangelo, 172 F.3d 288, 295 (3d Cir. 1999).

The Supreme Court laid out a four-part test for the admission of evidence under Rule 404(b) in Huddleston v. United States: (1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted.  Given, 320 F.3d at 460 (citing Huddleston, 485 U.S. 681, 691-92 (1988)).

### B.      Intrinsic Evidence

Separately from Rule 404(b), evidence may be admissible if it is "intrinsic" to proof of the charged offenses.  See United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999).  In United States v. Cross, the Third Circuit discussed the difference between intrinsic and 404(b) evidence:

> Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense." Fed. R. Evid. 404(b) advisory committee's note (citing United States v. Williams, 900 F.2d 823 (5th Cir. 1990)).  The distinction between intrinsic and extrinsic . . . evidence is often fuzzy.  One leading treatise calls the distinction "at best one of degree rather than of kind." 1 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 397 (7th ed. 1998).  Unfortunately, as the D.C. Circuit has explained, most circuit courts view evidence as intrinsic if it is "inextricably intertwined" with the charged offense (a definition that elucidates little) or if it "completes the story" of the charged offense (a definition so broad that it renders Rule 404(b) meaningless).  United States v. Bowie, 282 F .3d 923, 927-29 (D.C. Cir. 2000); see also id. at 929 (stating that "it cannot be that all evidence tending to prove the crime is part of the crime" because that would make Rule 404(b) "a nullity").

Cross, 308 F.3d 308, 320 (3d Cir. 2002).

The Third Circuit further held that "acts are intrinsic when they directly prove the charged conspiracy," but declined to adopt the other circuits' standard.  Id. (citing Gibbs, 190 F.3d at 217-18).  "Although other Circuits have held that evidence is intrinsic if it is 'inextricably intertwined' with or 'completes the story' of the charged offense, the Third Circuit has thus far reserved judgment on this question."  United States v. Cummings, 156 Fed.Appx. 438, 442-443

(3d Cir. 2005) (citing Cross, 308 F.3d at 320 n.19); see also United States v. Gilliard, 2005 WL 1279098, at *2 (E.D. Pa. May 25, 2005) ("[T]he Third Circuit has explicitly expressed no view on whether 'other acts' that are 'inextricably intertwined' with the events underlying the charge are 'intrinsic' to the offense charged and thus exempt from Rule 404(b).").

## V.    Discussion

### A.    Evidence of Other Transactions: Intrinsic Evidence Analysis

#### 1.    Intrinsic Evidence versus "Other Acts" Evidence

As stated above, "intrinsic" evidence—that is, evidence that "directly prove[s]" the charged offenses—is admissible without regards to Rule 404(b).  As this Court observed in a previous case, so-called "intrinsic" evidence is most often introduced in conspiracy cases. United States v. Comite, 2006 WL 3791340, at *6 (E.D. Pa. Dec. 21, 2006).  "Moreover, the Government in proving overt acts in a conspiracy is not limited by the specific acts listed in the indictment."  United States v. Holck, 398 F.Supp.2d 338, 373 (E.D. Pa. 2005) (citing United States v. Schurr, 794 F.2d 903, 908 (3d Cir. 1986); United States v. Adamo, 534 F.2d 31, 38-39 (3d Cir. 1976)).  The "intrinsic" evidence standard is also applicable "where the government has evidence of many instances of the allegedly illegal activity charged in the indictment, but has not charged each instance."  Comite, 2006 WL 3791340, at *6.

The Superseding Indictment describes the charged conspiracy as follows: "Using several corporate entities, the defendants identified small businesses for sale, used false and fraudulent pretenses to obtain control of those businesses, and continued the fraud long enough to drain the businesses' assets for both the defendants' personal enrichment and continuing promotion of the fraudulent scheme."  (Superseding Indictment ¶ 1.)  It further details the scheme as Kenneth

Mitan, using a false name, negotiating to purchase small businesses through one of his corporate entities and acquiring a controlling interest; failing to provide the full amount of money due under the sale agreement at closing; obtaining checks from the target company's bank account based on representations that they would be used to pay vendors and creditors; taking control of the target business's bank account and opening a shell account in the target business's name; instructing the diversion of target business funds to the shell account; sometimes placing representatives on-site to facilitate the fraudulent scheme; using these funds for purposes other than the maintenance of the businesses; and diverting funds to themselves or their corporate entities.  (Id. ¶¶ 8-12.)

Based on the Superseding Indictment's charges, the Government's description of the three transactions it now proposes to admit as evidence clearly match the fraudulent scheme charged.  The three transactions offered as proposed evidence fall within the same time period alleged in the Superseding Indictment (June 2005 through about February 2008), include the same four Defendants (although, as with the charged transactions, each Defendant was not involved in each transaction), involve the purchase of a business under similar fraudulent pretenses and where the seller allegedly did not receive full payment at closing, were carried out using nearly all of the same steps described in the Superseding Indictment, and each ended with the devastation and/or failure of the target business.  Although the Superseding Indictment only named four transactions as part of the conspiracy, the Government is not limited to the specific overt acts of these particular transactions.  See Holck, 398 F.Supp.2d at 373.

The Government asserts that financial transactions between the companies named in the Superseding Indictment and those offered as proposed evidence—including checks written and

money transferred back and forth and involvement of the same shell companies—demonstrate the intrinsic nature of the proposed evidence.  Although this evidence does tend to show the allegedly intertwined nature of Defendants' business dealings, this is not the basis of the Court's finding.  Instead, the Court is persuaded by the fact that each of the business transactions offered as proposed evidence have the same attributes as the charged fraudulent scheme and conspiracy described in the Superseding Indictment and summarized above.  Therefore the three transactions are direct proof of the elements of a conspiracy to commit wire and mail fraud under 18 U.S.C. § 1349: an agreement to commit mail fraud, the defendant's knowing joinder, and an overt act in furtherance of the conspiracy.  United States v. Gebbie, 294 F.3d 540, 544 (3d Cir. 2002); see also United States v. Fumo, 2008 WL 1731911, at *2 (E.D. Pa. Apr. 10, 2008) (noting that an indictment for conspiracy to commit mail and wire fraud need not allege that defendants agreed to use the mail and wires to perpetrate the fraud); United States v. Maze, 414 U.S. 395, 400 (1974) (noting that use of the mails need not be an essential element of the scheme).

Kenneth's asserted factual differences between the three transactions offered as proposed evidence and the four transactions in the Superseding Indictment—including that the sellers were in fact paid, that there were no fraudulent pretenses, that Spectacular Sports was an all-cash deal paid by wire transfer, and that the Williams Fund was not involved in the Tuckahoe transaction—are highly similar to factual arguments he previously has raised about the four charged transactions and which this Court previously has declined to consider on the merits prior to trial.  (See Def. Kenneth Mitan's Mot. Quash Indictment, Doc. No. 97; Mot. Dismiss Indictment, Doc. No. 109; Reply Mot. Quash, Doc. No. 124; Am. Mot. Dismiss Indictment, Doc. No. 141; Reply Mot. Dismiss Indictment, Doc. No. 196; Memo. & Order denying Motions, Doc.

Nos. 211, 212).  The documentary evidence he has provided in support of his arguments is insufficient to prove his contentions in the context of this Motion.  Any asserted factual differences between the charged transactions and proposed transactions appear at best highly contested and at worst inconsequential at this stage.  Based on the Superseding Indictment's broad description of the alleged conspiracy and scheme to defraud, the proposed evidence may directly prove the conspiracy and is therefore intrinsic.

This assessment is supported by caselaw where numerous instances of alleged illegal conduct existed, but the Government chose to charge only certain instances of the conduct.  In United States v. Benjamin, 125 Fed. Appx. 438 (3d Cir. 2005), the Third Circuit considered a similar situation where defendant, a government employee, was charged with unjustly enriching himself by ordering computers paid for by the government and re-selling them for his own profit. Id. at 439-40.  The indictment alleged seventeen counts related to defendant's computer mail fraud scheme involving computers shipped to New Hampshire and Florida.  Id.  However, the district court also allowed at trial, as "intrinsic" evidence, evidence of computers sold locally because it ruled that the local sales evidence demonstrated the defendant's over-arching scheme and constituted evidence of the crime charged.  Id. at 440-41.  The Third Circuit found that the district court had correctly ruled and that this did not create variance between the indictment and the proof at trial.  Id. at 441.

In addition, in United States v. Comite, this Court found that certain uncharged acts by defendant were admissible where they constituted essentially the same conduct as the charged conduct.  2006 WL 3791340.  In that case, the defendant was charged with defrauding a health care benefit program by submitting false and fraudulent claims for reimbursement.  Id. at *1.

-22-

The defendant was charged with twelve counts of out-of-office billing, i.e. submitting claims for reimbursement on dates when the government alleged she was out of the office.  However the government sought to introduce charts detailing the names of 321 patients and 426 claims of out-of-office billing.  Id. at *5.  This Court ruled that this evidence was admissible.  Id. at *7. Although the Court did not directly state whether the evidence was "intrinsic" or merely proper under 404(b), it described in detail the legal standard for intrinsic evidence, and therefore seemed to agree that the evidence met this standard.[1]  Id. at *6-8.  See also Holck, 398 F.Supp.2d at 372-73 (finding that in a public corruption conspiracy trial, evidence of a loan made at the request of one of the defendants to a friend and relative who was not charged in the indictment was admissible as intrinsic evidence because it was within the applicable time period of the conspiracy and because it was the first in a series of loans that constituted the conspiracy).

        **2.**        **Rule 403 Analysis**

Like any other evidence, to be admissible, intrinsic evidence must satisfy Rule 403.  See United States v. Jones, 2006 WL 1737209, at *8 n.10 (E.D. Pa. June 23, 2006).  Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403. The rule "creates a presumption of admissibility."  Cross, 308 F.3d at 323 (citing United States v. Universal Rehab. Serv. (PA), Inc., 205 F.3d 657, 664 (3d Cir. 2000) (en banc)).  "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis,

---

[1] However the Court also stated that such evidence "readily evinces intent, motive and the absence of mistake," which would implicate the Rule 404(b) standard.  Comite, 2006 WL 3791340 at *8.  Defendant Comite was acquitted by the jury.

commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee

Notes.  In the conspiracy context, the Third Circuit has held that "Rule 404(b) evidence is

especially probative when the charged offense involves a conspiracy," and "[f]or this reason, the

Government has broad latitude to use 'other acts' evidence to prove a conspiracy." Cross, 308

F.3d at 324 (citing United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000)).

### a.   Tuckahoe Enterprise Transaction

One of the proposed additional transactions, Tuckahoe Enterprises, presents unique issues

of prejudice.  Kenneth, Pankratz, and Atherton face pending criminal charges in New Jersey

related to their purchase of Tuckahoe Enterprises, and Kenneth argues that admitting such

evidence in this case would unfairly prejudice his right to a fair trial in New Jersey.  This Court

agrees.  The Tuckahoe transaction is uncharged conduct in this case, and by admitting evidence

of this transaction, Kenneth would be forced to defend himself in this Court, prejudicing his right

to defend himself on pending charges in New Jersey.  The New Jersey indictment was filed prior

to the federal indictment, and if the Government wanted to admit evidence of this transaction, it

could have charged it in the federal indictment.  The Court finds that this prejudice is obvious

and incurable, rendering this evidence inadmissible in the Government's case in chief.  However,

to the extent that specific, limited testimony regarding the Tuckahoe transaction is necessary to

explain elements of any of the charged transactions, such testimony may be admissible on this

limited basis, and subject to advance notice to the Court and Defendants.  Also, the Court

reserves any ruling on the use of this evidence during the Government's rebuttal in the event that

the Defendants have introduced it in their case.

Related to the Tuckahoe transaction, Kenneth raises an additional argument that because

Tuckahoe occurred subsequent to the transactions in the Superseding Indictment, it has diminished probative value.  As an initial matter, the Tuckahoe transaction (beginning in late summer 2007 and continuing through January 2008) was not subsequent, but was in fact contemporaneous, to the charged Pruscino Brothers transaction (beginning in October 2007 and running through February 2008).  Further, the Tuckahoe transaction falls within the alleged time period of the broader conspiracy: "on or about June 2005 through and including in or about February 2008."  (Superseding Indictment ¶ 1.)  In addition, the caselaw that Kenneth cites for his argument concerning subsequent "other acts" evidence does not wholly support his position.[2] However, since the Court agrees that the pending New Jersey charges make the Tuckahoe evidence inadmissible, his additional arguments need not be considered.

**b.**    **Spectacular Sports and Super-1 RV Transactions**

The remaining two transactions that the Government seeks to introduce, Spectacular Sports and Super-1 RV, do not present the same problems of prejudice as Tuckahoe.  However, the Court must assess their probative value balanced against additional risks of prejudice.

In Comite, in addition to the out-of-office billing evidence which this Court admitted, the Court also considered and rejected evidence proffered by the Government of "up-coding," i.e.

---

[2] In United States v. Procopio, 88 F.3d 21 (1st Cir. 1996), the court found that evidence of a 1993 criminal association was admissible to show a criminal association in 1991, stating that "later criminal association increases the likelihood of an earlier one."  Id. at 29.  Although the court admitted that the Rule 403 analysis was a close one and that "the need to reason backward from 1993 to 1991 further weakens the inference," the court still held that admitting the evidence was permissible to show association.  Id. at 30.  In United States v. Manafzadeh, 592 F.2d 81 (2d Cir. 1979), the court ruled that subsequent other crimes evidence was inadmissible not because it was subsequent to the alleged conduct but because none of the Rule 404(b) proper purposes applied.  Id. at 86-89.  Further, in that case, the subsequent transactions were "wholly unconnected transactions."  Id. at 88.

billing for a procedure with a higher reimbursement rate than the procedure actually performed. 2006 WL 3791340 at *1.  Specifically, the Government wished to introduce a chart summarizing 1,456 allegations of up-coding where the indictment charged only sixty-eight counts.  Id. at *7. This Court decided that this evidence was inadmissible not because it was not intrinsic or did not qualify as proper 404(b) evidence, but because the evidence was unfairly prejudicial under Rule 403.  Id. at *7-8.  The Court reasoned that because of the massive volume and complex nature of proposed evidence, the need for expert testimony about the proposed evidence, the defendant's argument that this conduct was proper, and the risk of greatly increasing the length of trial unnecessarily, the prejudice outweighed the proposed evidence's probative value.  Id.  By contrast, the admissible "out of office" billing evidence described above could be easily understood by lay jurors and did not depend on expert testimony.  Id. at *8.

Kenneth and Frank argue that the Government's proposed evidence here raises some of the same issues that this Court found unfairly prejudicial in Comite.  First, they claim that evidence of the two transactions may require expert testimony since they involve complex stock purchase agreements and other contracts, sophisticated business financing mechanisms, and numerous financial transactions over a period of time.  Second, Defendants argue that each of the transactions were legal, which will require the jury to assess the propriety of the proposed business transactions in addition to the propriety of those charged.  Third, they argue that the proposed evidence will likely increase the length of the trial and require extensive cross-examination of the Government's witnesses.

After considering all arguments and precedents, the Court will allow evidence of Spectacular Sports and Super-1 RV but requires the Government to limit its presentation of the

evidence to minimize prejudice and retain the focus of the trial to the charged transactions.  To facilitate this, the Court ordered at the August 26, 2009 hearing that the Government submit an Offer of Proof naming its witnesses and outlining their testimony as to Super-1 RV and Spectacular Sports.  The Court further instructed the Government that it will presumably limit that evidence to the acquisition of the target companies, and not on their subsequent management.  The Court will similarly limit Defendants' cross-examination and presentation of their defenses at trial.

In the Government's disclosure of anticipated "other acts" evidence (Doc. No. 300), the Government describes two witnesses who will be called as to the Super-1 RV Transaction, and several documents which will be introduced, and two witnesses on the Spectacular Sports Transaction and similar exhibits as well.  The exhibits relate primarily to the agreements, and evidence relating to the opening of bank accounts, allegedly by Frank Mitan.

Both Defendants have filed objections to this Offer of Proof (Doc. Nos. 306, 307, 335). Initially, the Court finds that the Government's Offer of Proof is limited to evidence relating to the acquisition, and rejects Defendants' arguments that opening of bank accounts relates more to management than acquisition.  The Court also rejects the Defendants' contentions that allowing the limited evidence as to acquisition will "open the door" and require significant evidence concerning management of the companies.  Although Kenneth Mitan downplays the significance that he used an alias name in negotiations with the owners of these businesses, that will be an issue for the jury.

Based on the representations made in this Offer of Proof, the Court grants the Government's Motion to admit evidence of the Spectacular Sports and Super-1 RV transactions

according to the terms of the Offer of Proof.

**B.      Evidence of Other Transactions: Rule 404(b) Analysis**

Although this Court finds that evidence of the other transactions is intrinsic and therefore a 404(b) analysis is unnecessary, it also finds that the evidence is admissible under Rule 404(b). As described above, "other acts" evidence is not admissible to show Defendants' character but is admissible for any of the purposes in Rule 404(b) if it meets the Huddleston four-prong test.

**1.      Proper Purpose**

The first requirement of admissibility under 404(b) requires the Government to show a proper evidentiary purpose by "'clearly articulat[ing] how that evidence fits into a chain of logical inferences' without adverting to a mere propensity to commit crime now based on the commission of crime then." United States v. Mastrangelo, 172 F.3d 288, 295 (3d Cir. 1999) (quoting United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992)).  In satisfying this burden, "a proponent's incantation of the proper uses of such evidence under the rule does not magically transform inadmissible evidence into admissible evidence." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999).  Neither a trial court nor an appellate court is comforted when a proponent attempts to justify "bad act" evidence by resorting to a mantra-like recitation of the provisions of Rule 404(b).  Id. at 137.

The Government argues the following proper purposes for the Tuckahoe, Spectacular Sports, and Super-1 RV evidence: intent and knowledge, common plan, consistent modus operandi, and absence of mistake with regard to the criminality of the conduct.  Conspiracy, mail fraud, and wire fraud are specific intent crimes, which require the Government to prove intent as to each Defendant.  See United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004); United

States v. Applewhaite, 195 F.3d 679, 684 (3d Cir. 1999).  Regardless of a defendant's theory of

defense, proper purpose under Rule 404(b) is determined by the facts and elements that the

government must prove.  Sampson, 980 F.2d at 888.

      The Court finds that intent and knowledge are proper purposes to admit evidence of the

two transactions.  "In order to admit evidence under the 'intent' component of Rule 404(b), intent

must be an element of the crime charged and the evidence offered must cast light upon the

defendant's intent to commit the crime."  United States v. Himelwright, 42 F.3d 777, 782 (3d Cir.

1994).  Although Kenneth argues that intent would not be a proper purpose under Rule 404(b)

where the defendant denies participation in the act or acts constituting the crime, citing United

States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978), here Defendants do not deny participation in

the business transactions but instead assert that the transactions were not fraudulent and that the

Government's evidence merely accuses them of business mismanagement.  The Court finds that

the Superseding Indictment and the proposed evidence allege numerous instances of intentional

fraudulent activity and therefore believes a reasonable jury could find intent to defraud from the

proposed evidence.  Furthermore, the fact of repeated instances of similar conduct against

multiple alleged victims and Defendants' repeated alleged profit from this conduct tends to show

that Defendants knew of its improper nature.  Because proving specific intent in a mail fraud case

is difficult, the Third Circuit has adopted "a liberal policy . . . to allow the government to

introduce evidence that even peripherally bears on the question of intent."  United States v.

Copple, 24 F.3d 535 (3d Cir. 1994).  It follows that the additional proposed transactions fit into

the chain of logical inferences to show Defendants' intent and knowledge as to the fraudulent

nature of their business dealings.

Based on the highly similar characteristics of the proposed evidence and the charged transactions, the "other acts" evidence also supports the showing of a common scheme or plan. "The existence of an overarching scheme can provide circumstantial evidence of a defendant's guilt by explaining his motive in committing the alleged offense. . . .  This is especially important when the charged offense requires specific intent . . . ."  Cross, 308 F.3d at 322-323 (citations omitted).  As the Third Circuit explained,

> Ordinarily, when courts speak of 'common plan or scheme,' they are referring to a situation in which the charged and the uncharged . . . [acts] are parts of a single series of events.  In this context, evidence that the defendant was involved in the uncharged . . . [act] may tend to show a motive for the charged . . . [act] and hence establish the commission of the . . . [act], the identity of the actor, or his intention.

J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp., 31 F.3d 1259, 1268-69 (3d Cir. 1994) (quoting Gov't of the V.I. v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992)).  The Court again rejects Defendants' arguments that the three transactions offered as proposed evidence are dissimilar to the four charged transactions.  Instead it finds that each of the transactions fits the Superseding Indictment's charge of the overall conspiracy, and therefore the proposed evidence is proper to infer a common plan and establish the commission of the charged unlawful conduct.

The Court further finds that the proposed transactions are relevant to Defendants' motive. Where Defendants were successful in carrying out their fraudulent scheme initially, their repeated performance of similar conduct and continuation of the scheme evinces a motive to profit from the alleged fraud.

### 2.    Relevance

Under prong two of the Huddleston test, evidence must be relevant, that is "having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The Supreme Court has explained that "evidence of a similar prior bad act 'is relevant . . . if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" United States v. Vega, 285 F.3d 256, 262 (3d Cir. 2002) (quoting Huddleston, 485 U.S. at 689). "All that is needed is some showing of a proper relevance." United States v. Sampson, 980 F.2d 883, 888 (3d Cir. 1992).

Based on the highly similar nature of the proposed transactions and the charged transactions, the Court finds that evidence of Spectacular Sports and Super-1 RV is highly relevant to the jury's assessment of the conspiracy and fraud charges. Defendants appear to argue that each of their business transactions was legitimate and legal and that the failures and/or bankruptcies of each business were due to no fault of their own. As such, additional evidence of allegedly fraudulent acquisitions and diversion of company assets is relevant to prove the fraudulent nature of Defendants' actions.

### 3.     Rule 403 Balancing

The third requirement of admission under Rule 404(b) requires that the evidence pass the Rule 403 balancing test described above. See Holck, 398 F.Supp.2d at 374. This analysis requires assessing the prejudice versus the probative value of the proposed evidence as discussed above in the intrinsic evidence analysis, supra Part V.A.2.b. Because the Court finds a risk of prejudice based on the complex nature of the proposed evidence and the concern that presentation of the proposed evidence will divert attention at trial from the charged offenses, the Court limits the introduction of Spectacular Sports and Super-1 RV evidence as outlined in the Government's Offer of Proof.

### 4. <u>Limiting Instruction</u>

Evidence admitted under Rule 404(b) generally requires a limiting instruction to ensure that the jury will not use "other crime" evidence to conclude that the Defendant is a bad person. <u>Holck</u>, 398 F.Supp.2d at 374.  This Court will issue proper limiting instructions as to the specific purposes for which the jury may consider the proposed evidence.

### D. <u>Louisiana Arrest</u>

The Government argues that evidence of Kenneth's use of a false name to law enforcement officials during his arrest in Louisiana is admissible to show intent, knowledge, and modus operandi of Kenneth's frequent use of false names to mask his identity and hide his illegal conduct.  The Government further argues that this evidence is highly probative because it shows use of a false name to law enforcement relating to criminal conduct.  The Government does not seek to admit any other evidence regarding the arrest, merely Kenneth's use of an alias.

In Count VI of the Superseding Indictment, Kenneth is charged with a violation of 18 U.S.C. § 1342, for use of a false name in carrying out the charged mail and wire fraud and conspiracy scheme.  The Superseding Indictment also describes Kenneth's use of a false name in approaching target businesses as part of the conspiracy count (Count I).  As discussed at the August 26, 2009 hearing, the Government has other forms of evidence available to show Kenneth Mitan's use of a false name and such evidence relates to the charged offenses, not other acts.  This Court finds that evidence of an arrest for conduct unrelated to the charged offenses—an outstanding Governor's Warrant from Michigan for contempt charges—is inherently prejudicial and not substantially more probative than other forms of less prejudicial evidence.  Therefore, this evidence fails the third prong of the 404(b) <u>Huddleston</u> test and is not

admissible.

E.    **Frank Mitan's Severance**

Frank argues that if the proposed evidence is admitted, his trial should be severed because his involvement in the additional three transactions is limited and his familial association with Kenneth would greatly prejudice him.  Under Rule 14, a court may sever a defendant's trial where joinder "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).  A decision to sever is within the discretion of the trial court.  United States v. Hart, 273 F.3d 363, 370 (3d Cir. 2001).  The defendant seeking severance bears the burden of showing prejudice from the joinder.  United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991).

As stated on the Record at the August 26, 2009 hearing, the Court will deny Frank's request for severance because he has not met his burden to show prejudice.  Where defendants are charged under the same conspiracy, as here, acts committed by one defendant in furtherance of the conspiracy are admissible against the other defendants in the conspiracy.  Hart, 273 F.3d at 370.  Therefore, even though Frank argues that his participation in the various transactions is limited, evidence of these transactions is still admissible against him as acts in furtherance of the conspiracy in which he was involved.  This Court will properly instruct the jury to give separate consideration as to each defendant, to address Frank's concerns of prejudice.  Moreover, "[t]he public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy."  Eufrasio, 935 F.2d at 568 (citing United States v. De Peri, 778 F.2d 963, 984 (3d Cir. 1985)).  Therefore, Frank shall be tried with his alleged co-conspirator.

VI.   <u>**Conclusion**</u>

For the foregoing reasons, the Government's Motion In Limine is granted in part and denied in part.  The Court notes that this Order is conditional, but based on the Government's Offer of Proof and the applicable law, the Government's position that its evidence is intrinsic and admissible under 404(b) is upheld.  However, as a matter of trial management, the Court reserves the right to change this ruling if the case is unduly extended for any reason or the Court finds that the proffered "other acts" evidence will be confusing to the jury.  The Court assumes that the Government will introduce the evidence as to the charged acts first, and that the evidence as to the "other acts" will come towards the end of the case.

An appropriate Order follows.

_____

O:\Criminal Cases\08-760 Mitan, us v\Memo re 404(b) Motion.wpd