**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KENNETH MITAN | : | NO.   08-760-1 |

**MEMORANDUM RE: POST-TRIAL MOTIONS**

**Baylson, J.**                                                                                                                **April 9, 2010**

**I.      Background**

On December 18, 2008, a federal grand jury returned a six-count indictment against Defendants Kenneth Mitan, Frank Mitan, Charro Pankratz and Bruce Atherton (Doc. No. 1).  The indictment charged all four Defendants with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (Count One), and further charged Defendants Kenneth Mitan and Frank Mitan with two counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts Two and Three), and two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Four and Five).  The indictment also charged Kenneth Mitan with use of a false name in furtherance of mail fraud, in violation of 18 U.S.C. § 1342 (Count Six).  On April 23, 2009, the grand jury returned a superseding indictment adding Count Seven, charging Kenneth Mitan with making a false statement before this Court in violation of 18 U.S.C. § 1623.[1]

Defendant Kenneth Mitan, after a detailed colloquy, insisted on representing himself pro se.  The Court appointed Ann Flannery, Esquire as his stand-by counsel.  As the pretrial aspects of the case proceeded, the complexity of the case required Ms. Flannery to take an active role,

---

[1] Count Seven was dismissed without prejudice on December 2, 2009 (Doc. No. 500).

particularly concerning discovery matters with the government and subpoenas to various witnesses requested by the Defendant. In this role, Ms. Flannery, a former federal prosecutor and law professor, performed skillfully, admirably, and in the highest traditions of the Bar. At trial, the Court agreed to a hybrid representation where Defendant Kenneth Mitan was allowed to cross examine certain witnesses and present the closing argument, and Ms. Flannery handled other aspects of the trial, all of which was explained to the jury.

The trial began on October 13, 2009 against Kenneth Mitan and his father, Frank Mitan.[2] Defendants Pankratz and Atherton had entered into plea agreements with the government. Although Defendant Atherton did testify at the trial, Defendant Pankratz did not.

On November 6, 2009, the jury returned a verdict of guilty as to Kenneth Mitan on all counts, and guilty as to Frank Mitan as to Counts Two through Five. Frank Mitan was acquitted of conspiracy. On January 29, 2010, Defendant Kenneth Mitan filed his Post-Trial Motion for Judgment of Acquittal or New Trial (Doc. No. 532).

The Court requested supplemental briefing on several points and will now determine the post-trial motions.

## II. Standard of Review

Following the verdict of guilty against Kenneth Mitan on all counts, the Court must review the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60 (1942). In determining the Defendants' alternate Motion for a New Trial, the Court has discretion to determine whether a miscarriage of justice has occurred or whether the Court committed a legal error in the admissibility of evidence or in the charge to the jury. See, e.g.,

---

[2]Frank Mitan died on March 30, 2010.

United States v. Vitillo, 490 F.3d 314, 325 (3d Cir. 2007) ("The decision to grant or deny a motion for a new trial lies within the discretion of the district court." (quoting United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006))).

## III. Conspiracy

The essence of the conspiracy charge against Kenneth Mitan consisted of four separate, but interrelated, schemes to defraud the owners of certain small businesses. The indictment charged, and the government presented evidence, that from approximately June 2005 through February 2008, Kenneth Mitan set about to acquire the stock of the following four small, basically family-owned businesses:

- a. Benny's Cheese Company
- b. Engel Corporation
- c. Housewares Distributors, Inc. ("HDI")
- d Pruscino Brothers Produce ("Pruscino")

The government's evidence showed a consistent pattern used by Kenneth Mitan in taking control of these companies and then intentionally and willfully refusing to follow through on material representations and promises that he had made to the owners. The basic thrust of the scheme was similar in all four instances: Kenneth Mitan, using the false name "John Adams," contacted each of the owners and indicated that he was acting on behalf of the "Williams Fund" – the fictitious name of a dummy company that the jury was entitled to conclude was equally fictitious and a figment of Kenneth Mitan's imagination.

The evidence allowed the jury to determine that the Williams Fund was a front and was nothing more than a name that Kenneth Mitan and his father, Frank Mitan, had invented as the

vehicle by which these independent businesses would be acquired. In each instance, Kenneth Mitan met with the owners, expressed a great deal of interest in purchasing the stock of these businesses, and indicated that he had the backing of a supposedly wealthy investor in the Williams Fund. In each instance, a stock purchase agreement was negotiated and executed with a closing date.

Inevitably, Kenneth Mitan appeared late for every closing, employing various excuses. Once present at each closing, Kenneth Mitan did not deliver all of the funds that he had agreed to supply under the stock purchase agreement, instead making various excuses and seeking delays. In each instance, the seller accepted Kenneth Mitan's excuses, and proceeded to sign over the stock of the company to Kenneth Mitan. Having thus become owner of each company through control of its stock, Kenneth Mitan used the assets of each company to make certain payments to the former owners, but in all four instances, never made full payment as promised in the stock purchase agreement.[3]

The evidence was sufficient to prove the conspiracy charge. Kenneth Mitan did not accomplish these acquisitions alone, and the subsequent management of the acquired companies was handled with other people. Thus, the jury could have found that all of this conduct was in

---

[3]Kenneth Mitan tried to set up, as a "strawman argument," a contention that the government's case was based on the impropriety of his using funds of the corporations he then had control of to pay the former owners. This was not the government's theory, and such action is not in and of itself illegal. Once Kenneth Mitan obtained control of the companies, he did have the right to use the assets of the company to pay the former owners – although some of them expressed surprise since Kenneth Mitan had often stated that the Williams Fund would use its own capital to invest in the acquired company. Thus, these statements could have been found by the jury to be evidence of the conspiracy and fraudulent scheme. However, none of the agreements required Kenneth Mitan to put new money into the acquired company or to pay the former owners with assets other than what the former owners had left in the business when Kenneth Mitan acquired the stock of the company.

-4-

furtherance of the conspiracy. The evidence further showed that Kenneth Mitan used his father and mother for other purposes such as opening bank accounts, drawing checks, making mailings, and this evidence further supported the conspiracy conviction.

There was testimony that Ms. Pankratz committed certain acts in connection with the acquisition of Pruscino Brothers Produce. (Tr. 11/2/2009 at 110-17.) The evidence demonstrated that Ms. Pankratz held herself out as the President of C.P. Produce and Foods, Inc. at the time it fraudulently purchased Pruscino Brothers Produce on October 19, 2007, despite the fact that the company was not a legally incorporated entity until November 2, 2007. (GX 531; Tr. 10/21/2009 at 111-19; Tr. 10/22/2009 at 24.) The jury could have found that this conduct was in furtherance of the conspiracy, which was introduced into the record by satisfactory evidence even though Ms. Pankratz did not testify.

Co-Defendant Bruce Atherton, who did testify at trial, provided factual support for the government's conspiracy charges by his testimony showing that he carried out certain conduct which assisted Kenneth Mitan's scheme, conduct of which the jury was entitled to find was in furtherance of the conspiracy. After representing the Williams Fund in legal disputes arising from the Benny's Cheese and Engel Corporation transactions,[4] Atherton subsequently used two corporations under his control to do business with the Mitan family related to their fraudulent acquisitions of businesses. (Tr. 10/29/2009 at 112-13.) The first of these businesses,

---

[4]The government introduced the testimony of Kenneth and Frank Mitan from the arbitration hearing concerning the Engel Corporation acquisition and operation, suggesting it was false and in furtherance of the conspiracy. (Tr. 10/19/09 at 18-60.) After the Court initially told the jury that this testimony was only admissible against each individual declarant (Tr. 10/19/09 at 18, 35), the jury was subsequently instructed in the jury charge that it could consider this testimony against both Defendants. (Tr. 11/3/09 at 126.)

Commonwealth Management, sent employees, including Bruce Coe and Jennifer Pennel, to work at HDI, Inc. following the fraudulent acquisition of HDI by the Williams Fund and Kenneth Mitan. (Tr. 10/29/2009 at 112-13.) The second Atherton entity, American Transactional Accounting, was formed to manage proceeds derived from businesses acquired by Kenneth Mitan, including Pruscino Brothers Produce. (Tr. 10/29/2009 at 151-155.) Moreover, accounts controlled by Atherton were used to divert receivables from Pruscino Brothers Produce to Kenneth Mitan's girlfriend in Moscow, Russia. (Tr. 10/29/2009 at 155-58.)

Additionally, there was testimony concerning David Wendell, who was an associate of Kenneth Mitan and who was brought in to help conduct some of the affairs of the Pruscino business. Kenneth Mitan testified that David Wendell was also one of his "clients" who assisted him in acquiring companies, and further admitted that when "representing" Mr. Wendell, he used the false name "John Miller." (Tr. 11/2/2009 at 202-03.) Similarly, the jury also heard extensive evidence that Teresa Mitan – Kenneth Mitan's mother, and Frank Mitan's ex-wife – opened numerous shell accounts into which fraudulently obtained proceeds were diverted and redistributed. (GX 5, GX 6; GX8; GX R1.) Kenneth Mitan himself testified that he periodically asked his mother to conduct transactions on his behalf as part of his "business." (Tr. 11/2/2009 at 202-05.)

The Court further agrees with the government's argument that Kenneth Mitan's own testimony may be considered in assessing the sufficiency of the evidence on the charge of conspiracy. Kenneth Mitan testified to a number of conversations and transactions he had with third parties, many of which the jury could have found were pursuant to and in furtherance of the conspiracy. Even though the jury obviously disbelieved Kenneth Mitan's testimony to a

significant extent, in that his testimony constituted a complete denial of all charges, the jury was entitled to consider some of the testimony as part of the evidence in support of the government's charge of conspiracy. See, e.g., United States v. Brown, 53 F.3d 312 (11th Cir. 1995).

**IV.    Sufficiency of the Evidence as to Counts Two - Five Charging Mail and Wire Fraud**

The evidence presented at trial was sufficient for the jury to conclude that the mailings and wires charged in Counts Two through Five were in furtherance of the scheme to defraud Benny's Cheese Company.

Regarding Counts Two and Three, the evidence at trial included testimony from Cathy Dankel that on October 26 and 28, 2005, she sent receivables checks from Benny's Cheese to the Chase Bank branch in West Bloomfield, Michigan, on the instruction of Kenneth Mitan, who she believed was named John Adams. (Gov't Ex. 13; Tr. 10/14/2009 at 140-45.) Government Exhibit 13 includes copies of Federal Express Air Bills and deposit slips which Ms. Dankel testified that she shipped to the Bank One branch on October 26, 2005. This exhibit, along with Ms. Dankel's testimony, demonstrates that the mailing on October 26, 2005 to Bank One entailed receivables checks made out to Benny's Cheese in the amount of approximately $10,921.62. (Gov't Ex. 13; Tr. 10/14/2009 at 140-45.) Ms. Dankel testified that she undertook this mailing because Kenneth Mitan, who had identified himself as John Adams, told her he had opened a Bank One account, and that from that point forward, she should mail everything directly to Bank One. (Tr. 10/14/2009 at 143.) Ms. Dankel further testified that on October 28, 2005, she sent receivables checks totaling approximately $6,454.36 to Bank One – testimony confirmed by Government Exhibit 13. (Tr. 10/14/2009 at 144-45; Gov't. Ex. 13.)

Accordingly, the evidence at trial supports the jury's conclusion that these mailings were

caused by Kenneth Mitan and were in furtherance of the scheme to defraud Benny's Cheese Company. In this case, the government argued, as the superceding indictment alleged, that a central aspect of the charged scheme to defraud was the diverting of incoming receivables checks from the control of Benny's Cheese's employees into the Bank One shell account opened by Defendant Frank Mitan. Ms. Dankel's October 26 and 28, 2005 mailings took place within the time period alleged in the superceding indictment, and the trial record establishes that Ms. Dankel mailed a total of $17,375.98 on those two dates from Benny's Cheese Company in Philadelphia to be deposited in the Chase Bank account in West Bloomfield, Michigan. The jury received evidence that monies from this Chase Bank account were diverted to pay personal expenses. (Gov't. Ex. B6.) Thus, the jury was justified in finding that these mailings were in furtherance of the scheme to defraud charged in Counts Two and Three.

Regarding Counts Four and Five, the evidence at trial demonstrated that on November 11 and 27, 2005, Kenneth Mitan used the e-mail address "williamsfund@mac.com" to send e-mail messages to employees of Benny's Cheese in furtherance of the charged scheme to defraud. (Gov't. Ex. 17; Gov't Ex. 21; Tr. 10/13/2009 at 88-91; Tr. 10/14/2009 at 177.)

Government Exhibit 17 is an e-mail dated November 11, 2005 from Kenneth Mitan, writing under the name John Adams, and is addressed to Carmella Carabello and Cathy Dankel, both of Benny's Cheese. In the e-mail, Kenneth Mitan discusses concerns regarding the failing state of Benny's Cheese since the Williams Fund had gained control of Benny's Cheese's operations. The e-mail concludes with Kenneth writing: "[t]oday's deposit should be overnighted to Bank One, with any remaining deposits after today held for deposit Monday." (Gov't. Ex. 17.)

Government Exhibit 21 is an e-mail dated November 27, 2005 from Kenneth Mitan, again writing as John Adams, to Ms. Dankel. In the e-mail, Kenneth Mitan asks Ms. Dankel to convey to him information regarding "weekly receipts and expenditures," and instructs her to "advise immediately." Also in the e-mail, Kenneth Mitan also asks: "[W]ho is left on COD?" – a question referring to vendors who had placed Benny's Cheese Company on a "cash on delivery" basis for the provision of food products due to the Williams Fund's failure to make timely payments of Benny's Cheese's outstanding bills in the weeks following closing. (Tr. 10/13/2009 at 88; Tr. 10/14/2009 at 59-60.) Ms. Dankel testified that in her response to this e-mail, she sent Kenneth Mitan the information that he requested. (Tr. 10/14/2009 at 177.)

The Court finds that the e-mails of November 11 and 27, 2005 support the jury's guilty verdict that the mailings and wires described in Counts Four and Five were in furtherance of the scheme to defraud Benny's Cheese Company. With regard to Count Four, it was proper for the jury to conclude that Kenneth Mitan, in using the November 11, 2005 email (Gov't. Ex. 17) to urge employees of Benny's Cheese to divert incoming receivables to the shell bank account at Bank One, engaged in conduct which was charged in the superceding indictment as part of the scheme to defraud. With regard to Count Five, it was proper for the jury to conclude that Kenneth Mitan, in the November 27, 2005 e-mail (Gov't. Ex. 21), furthered the charged scheme in several ways, including by asking for financial information regarding Benny's Cheese to further facilitate the defrauding of the company, as well as by maintaining the illusion that Kenneth Mitan, as John Adams, remained in charge and was taking care of Benny's Cheese's outstanding issues.

Thus, for the aforementioned reasons, the evidence presented at trial was sufficient for the

jury to conclude that the mailings and wires charged in Counts Two through Five were in furtherance of the scheme to defraud Benny's Cheese Company.

## V. **Defendants' Motion for New Trial**

Most of the issues raised in the Defendants' Motion for New Trial were carefully considered during the trial, and the Court's rulings are reflected either in Memoranda prepared or rulings made before or during the trial. The following chart will provide a reference for these rulings.

|  |  |
| --- | --- |
| 1. Allegations that government agents improperly listened to telephone conversations of Kenneth Mitan while he was a pretrial detainee of the Federal Detention Center | Memos & Orders relating to telephonic communications:<br>• 9/25/09 (Nos. 356, 357)<br>• 11/9/09 (Nos. 492, 493) |
| 2. The Court improperly refused to issue subpoenas to allow testimony & other evidence | Memos & Orders relating to Subpoenas:<br>• <u>e.g.</u> 5/12/09 (No. 184); 8/13/09 (No. 259); 9/3/09 (No. 305 sealed); 9/25/09 (No. 347 sealed); 9/25/09 (No. 348 sealed): 9/29/09 (No. 370 sealed); 10/2/09 (No. 376 sealed); 10/7/09 (No. 390 sealed); 10/21/09 (No. 431); 10/26/09 (No. 447);10/26/09 (No. 450); 11/2/09 (No. 471) |
| 3. The Court erred in allowing admission of the testimony during the Engel arbitration | Memo relating to arbitration testimony:<br>• 11/30/09 (No. 465) |
| 4. Admissibility of F.R.E. 404(b) testimony concerning Super One RV and Spectacular Sports, and failure of Williams Fund to file tax returns | Memo & Order relating to admissibility of 404(b) evidence:<br>• 9/24/09 (Nos. 343, 344)<br><br>Memo relating to admissibility of tax evidence:<br>• 11/30/09 (No. 465) |
| 5. Failure to Grant Severance | Memo & Order relating to Kenneth Mitan's Motion to Sever:<br>• 7/28/09 (Nos. 245, 246) |

Kenneth Mitan has raised several other asserted errors by the Court during the trial as follows:

6. Refusal to allow testimony concerning vendor payments: This allegation is unsupported in the record. Certain vendors to the acquired companies were called by the government to testify that they were not paid the amounts owed to them by the companies that Kenneth Mitan had acquired. Kenneth Mitan had the right to cross examine them. The Court did not prohibit subpoenas to other vendors, but noted that the number of vendors would be limited. Kenneth Mitan failed to take up the Court's offer to subpoena additional vendors, and thus cannot complain about a ruling in the abstract when he did not take advantage of all of the subpoenas the Court had offered to issue.

7. Refusal to allow appropriate cross examination of Emory Davis: Emory Davis, who had been involved in transactions with Kenneth Mitan, was called by the government as a rebuttal witness after Mitan, in his own defense, gave certain testimony about Davis. Davis contradicted Kenneth Mitan, and Kenneth Mitan was allowed full cross examination of Davis.

8. Improper charge as to Count Four: This charge was not improper. The indictment in Count Four alleged that there was a mailing on November 11, 2005. The government's evidence showed an e-mail sent on November 11, 2005 from Kenneth Mitan, writing as "John Adams," addressed to Carmella Carabello and Cathy Dankel, both of Benny's Cheese, directing that a deposit should be sent by overnight carrier to a Bank One account. (Gov't Ex. 17.) The description in the indictment of this e-mail was as follows:

> An e-mail message sent via computer servers in California to a representative of Benny's Cheese in Philadelphia, Pennsylvania, directing that receivables payable to Benny's Cheese be sent by overnight carrier to a bank in Columbus, Ohio.

The jury raised a question about this description. (Tr. 11/4/09 at 32-39.) Indeed, there is no evidence in the record that the Bank One branch is located in Columbus, Ohio. Instead, the evidence in the record indicates that the Bank One branch in question is located in West Bloomfield, Michigan. The Court told the jury that the description in the indictment was for the jury's benefit, and was not an element of the crime. This was not error. See, e.g., United States. v. Behmanshah, 49 Fed. Appx. 372, 376 (3d Cir. 2002) ("The indictment erred in describing the moneys as transferred from [a] PNC [bank] account and deposited into [a] Commonwealth [bank] account, because in actuality both accounts were at PNC. . . . Because the alleged error does not affect the elements of the crime charged, it is a variance . . . . If a variance between the indictment and the evidence 'does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant.' [Defendant] has failed to demonstrate any prejudice presented by the variance . . . [and thus,] no reversible error occurred." (internal citations and quotations omitted)); see also United States v. Stansfield, 171 F.3d 806, 812 (3d Cir. 1999) ("An indictment is an accusation only, and its purpose is to identify the defendant's alleged offense, and fully inform the accused 'of the nature of the charges so as to enable him to prepare any defense he might have.'" (internal citations omitted)); United States v. McDade, 28 F.3d 283, 301 (3d Cir. 1994) ("[T]he indictment is not evidence."); Third Circuit Model Criminal Jury Instruction 3.07 ("An indictment is simply a description of the charge(s) against the defendant. It is an accusation only. [It] is not evidence of anything . . . .").

9. Improper comments by the prosecutor concerning Kenneth Mitan's pro se status: These were not improper or prejudicial.

10. When the jury began deliberations, the jury requested further clarification on a

charge of conspiracy. The Court gave a description of conspiracy in lay language. Under settled precedent, this was not error. As the Supreme Court has stated:

> Once the judge has made an accurate and correct charge, <u>the extent of its amplification must rest largely in his discretion</u>. The trial judge in the light of the whole trial and with the jury before him may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. . . . In this case the jury asked a rereading of the charge on conspiracy. After repeating his instruction, the court inquired of the jury whether anything about it was not clear, or whether there was anything which they desired to have amplified. Nothing was suggested, although inquiry was made as to other matters. While many judges would have made a more extended charge, we think the trial court <u>was within its area of discretion</u> in his brevity.

<u>United States v. Bayer</u>, 331 U.S. 532, 536-37 (1947) (emphasis added). Further, the Third Circuit has stated:

> [Defendant] argues . . . that [the Judge]'s response to a note from the jury during deliberations deprived him of his due process rights. . . . Because the gist of [Defendant]'s argument is that the wording of [the Judge]'s response was confusing or lacking, and not that it recited the improper legal standard, we will review for an abuse of discretion. . . . First, "'when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation.'" [The Judge]'s preliminary instructions correctly set forth the basic elements of conspiracy. . . . These instructions properly set forth the legal standard for the jury, and mitigates any problem created by the response to the note. . . . <u>[The] Judge . . . did not abuse his discretion in responding as he did</u>.

<u>United States v. Jones</u>, 126 Fed. Appx. 560, 565-66 (3d Cir. 2005) (internal citations and footnote omitted) (emphasis added). Moreover, Judge Ditter has stated:

> Finally, defendant asserts I erred in responding to a question submitted by the jury during its deliberation. . . . Once a question comes from the jury, "it is for the <u>trial judge to construe</u> . . . [it] and to <u>determine the content and form</u> of the answer to be returned." Moreover**,** <u>in his discretion</u>, the trial judge <u>may in answering the question, provide an explanation or clarifying response</u>. Here, the response given was necessary to answer the question fully in light of its ambiguity. . . . [M]y response was proper and did not prejudice defendant.

United States v. Lehr, 562 F. Supp. 366, 377-78 (E.D. Pa. 1983) (Ditter, J.) (internal citations, quotations, and footnotes omitted) (emphasis added). Thus, under settled precedent, it is clear that trial judges have discretion in answering jury questions. See also Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 175-76 (1st Cir. 1998); United States v. Munoz, 150 F.3d 401, 417-18 (5th Cir. 1998); Commercial Union Assur.Companies v. Sears, Roebuck and Co., 716 F.2d 606, 609-10 (10th Cir. 1983).

## VI.    Conclusion

      For the aforementioned reasons, the post-trial motions will be denied.

An appropriate Order follows.

O:\Criminal Cases\08-760 Mitan, us v\Mitan - Memo posttrial motions.wpd